801 A.2d 205

IN THE MATTER OF THE COMMITMENT OF W.Z.

Argued January 28, 2002—Decided July 11, 2002.

110

*Joan D. Van Pelt*, Assistant Deputy Public Defender, argued the cause for appellant W.Z. (*Peter A. Garcia*, Acting Public Defender, attorney).

*Nancy Kaplen*, Assistant Attorney General, argued the cause for respondent State of New Jersey (*Peter C. Harvey*, Acting Attorney General, attorney; *Mary Beth Wood*, Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

LaVECCHIA, J.

In 1998 the Legislature passed the New Jersey Sexually Violent Predator Act (SVPA or Act), *N.J.S.A.* 30:4–27.24 to 27.38; *L.* 1998, *c.* 71, effective August 12, 1999. We are informed that since its enactment the State has used the Act to civilly commit approximately 225 sex offenders. This appeal presents our first opportunity to consider a challenge to the Act's constitutionality.

W.Z. appeals from a judgment finding him to be a sexually violent predator under the SVPA and committing him to the Special Offenders Unit at the Northern Regional Unit (NRU) in Kearny, New Jersey. In its decision below, the Appellate Division rejected W.Z.'s constitutional and other challenges and upheld W.Z.'s commitment. While W.Z.'s appeal to this Court was pending, the United States Supreme Court issued its decision in *Kansas v. Crane*, 534 *U.S.* 407, 122 *S.Ct.* 867, 151 *L.Ed.*2d 856

(2002). In that case the Court clarified the substantive due process limitations on a state's ability to identify the mental abnormalities that render a sex offender eligible for civil commitment because of his or her dangerousness. Specifically, *Crane* held that a state may not civilly commit a sex offender without making a determination about the person's "lack of control" over his or her sexually violent behavior. *Id.* at ——, 122 *S.Ct.* at 870, 151 *L.Ed.*2d at 862. In so holding, the Court rejected the claim that a sex offender's lack of control must be demonstrated to be total or complete; rather, the Court acknowledged a state's authority to commit those sex offenders who have "serious difficulty in controlling [their] behavior." *Ibid.*

The substantive due process limitations expressed in *Crane* inform our consideration of this challenge to the constitutionality of the SVPA.

## I.

The facts of W.Z.'s extensive criminal and juvenile record and the expert testimony adduced at his commitment hearing were detailed in the Appellate Division's opinion, *IMO Commitment of W.Z.*, 339 *N.J.Super.* 549, 556–61, 773 *A.*2d 97 (App.Div.2001), and are incorporated as if fully set forth herein. We recite only a summary.

Three of W.Z.'s offenses were of a sexual nature and were committed against women. Those are aggravated assault and criminal sexual contact committed in 1982 when W.Z. was 16 years old; aggravated sexual assault, aggravated assault, criminal restraint, and terroristic threats arising from W.Z.'s attempted rape of a woman he met at a bar in 1989; and criminal sexual contact of a woman he accosted in 1994. The parties do not dispute that, based on that criminal record, W.Z. has been convicted of a "sexually violent offense" required as a predicate for civil commitment under the SVPA. *N.J.S.A.* 30:4–27.26.

Over a period of years, numerous clinicians have evaluated W.Z. to determine whether he poses a threat of committing additional

sexual offenses. In 1991, following his first conviction for aggravated sexual assault, W.Z. was evaluated by Dr. Kenneth McNiel at the Adult Diagnostic Treatment Center (ADTC) in Avenel for the purpose of determining his eligibility for sentencing under the New Jersey Sex Offender Act, *N.J.S.A.* 2C:47–1 to –10 (requiring diagnosis of repetitive and compulsive sexual behavior). That evaluation diagnosed W.Z. as suffering from an antisocial personality disorder with narcissistic features. Dr. McNiel noted concerns about W.Z.'s interpersonal explosiveness, self-indulgence, violent potential, and anger towards women, but opined that the 1989 sexual assault was more an act of antisocial violence and impulsive exploitation than of sexual compulsivity. Therefore, W.Z. was determined to be not eligible for sentencing under the Sex Offender Act.

The State initiated the present commitment proceeding in December 1999 when W.Z. was approaching the expiration of his sentence for the 1994 criminal sexual contact conviction. The petition for civil commitment was supported by clinical certificates prepared by Leonard B. Archer, M.D., and James R. Varrell, M.D. Each certified that W.Z. was a person "suffer[ing] from a mental abnormality (as defined by the Act) or personality disorder that makes [him] likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment." Based on the petition and accompanying certifications, the trial court found reasonable cause to commit W.Z. temporarily to the NRU pending a final hearing.

At the final hearing conducted in April 2000, the State presented the testimony of Dr. Jackson T. Bosley, a psychologist at the NRU, and Dr. Stanley R. Kern, a NRU psychiatrist. Dr. Anthony V. D'Urso, a licensed clinical psychologist and professor of graduate psychology at Montclair State University, testified on behalf of W.Z. As noted by the Appellate Division, the testimony of the experts "was surprisingly consistent and raised few issues of fact." *IMO of Commitment of W.Z., supra,* 339 *N.J.Super.* at 559, 773 *A.*2d 97.

Dr. Bosley evaluated W.Z. at the time that the petition for commitment was filed in December 1999. His report stated that W.Z. poses a risk as a violent predator, and that W.Z.'s past behavior indicates that he "can use sexuality as a weapon in his criminal acts." At the hearing, Dr. Bosley testified that he performed the Minnesota Sex Offender Screening Tool Revised (MnSOST–R), the California Actuarial Risk Assessment Table (CARAT), the Adult Sex Offender Risk Assessment Schedule (ASORAS), the Static–99, and the Registrant Risk Assessment Scale (RRAS) on W.Z. and found that all but one of the actuarial tools placed W.Z. within a high range of risk of sexually recidivating. The RRAS placed W.Z. within the moderate risk range. Based on the tests used during his evaluation of W.Z., and the lack of discrepancy in their results, Dr. Bosley opined that W.Z. posed a high to moderate risk to recidivate. In respect of W.Z.'s volitional control over his acts, Dr. Bosley opined that W.Z. did not possess sufficient internal controls to curb his antisocial behavior and expressed concern that if he were to be released from a structured and supervised environment, W.Z. would pose a high or moderate risk of committing another sexual offense.

Dr. Kern likewise issued a report on his evaluation of W.Z. and testified at the hearing. He stated that W.Z. suffers from intermittent explosive disorder, antisocial personality disorder with narcissistic tendencies, and alcohol abuse. Dr. Kern explained that antisocial personality disorder is "characterized by inability to behave to control one's behavior" and that "if that includes sexual acting out, that will include sexual acting out." In Dr. Kern's opinion, W.Z.'s mental disorders affect his emotional and volitional functions, causing him to behave in an antisocial fashion and to pose a danger to society, particularly in a sexual way. Dr. Kern recommended that W.Z. remain at the NRU because he presents a danger to society. In his testimony, and in his written report, Dr. Kern conceded that W.Z.'s compulsive behavior is part of his general criminal behavior, that W.Z. does not have a sexual compulsion, and that although he retains the ability to exert

volitional control over his sexual behavior, he does not exercise that control.

W.Z. presented testimony by Dr. D'Urso, who had evaluated W.Z. in February 2000. In his report of that evaluation, Dr. D'Urso diagnosed W.Z. with antisocial personality disorder, substance abuse, and intermittent explosive personality disorder. Dr. D'Urso found that W.Z.'s sexual behavior was more "situational" than compulsive, and that although W.Z. has a propensity to commit antisocial crimes his criminal history does not reflect a pattern of compulsive sexual conduct. At the civil commitment hearing, Dr. D'Urso testified that W.Z. tends to minimize his prior offenses and is highly impulsive, immature, and hedonistic. Dr. D'Urso also stated that W.Z. does not maintain intimate relationships with people, demonstrates little remorse, and exhibits poor insight into his own behavior. Dr. D'Urso opined that W.Z.'s three sexual offenses "appear to be related to [W.Z.'s] general pattern of antisocial behavior and the violence and aggression he demonstrates against people when he's angry, frustrated." He added that the offenses "also appear to be related to intoxication and severe alcohol abuse." Dr. D'Urso further stated that notwithstanding that W.Z. retains volitional control over his acts, he suffers from an antisocial personality disorder that causes him to ignore the rights of others. Based on the repetitive nature of W.Z.'s criminal offenses, Dr. D'Urso concluded that W.Z. possesses a "great likelihood" of future violent behavior, and that he would anticipate that twenty percent of W.Z.'s future violent behavior would involve acts of sexual violence.

At the commitment hearing W.Z. argued that he did not fall within the purview of the SVPA because he was not diagnosed as suffering from a sexual compulsion or a paraphilia. He also argued that to commit an individual under the SVPA the State must prove that a sex offender has an inability to control dangerous sexual behavior within the reasonably foreseeable future.

The trial court concluded that the SVPA requires a finding that the person is unable to control dangerous sexual behavior and that

the risk of sexual recidivism must be reasonably foreseeable. However, the court rejected the contention that W.Z. retained the ability to control his dangerous sexual behavior. Although all experts agreed that W.Z. does not suffer from a paraphilia or a sexual compulsion, the court found that the experts uniformly recognized that W.Z.'s antisocial personality disorder, in combination with his alcohol abuse and intermittent explosive disorder, predisposes him to commit acts of sexual violence and contributes to the likelihood that he will sexually recidivate in the reasonably foreseeable future. The court therefore held that the record contained clear and convincing evidence that W.Z. was unable to control his dangerous sexual behavior and that he was likely to commit additional sexual offenses in the reasonably foreseeable future. Accordingly, the court entered an order of commitment to the NRU.

W.Z. appealed, contending that substantive due process requires a finding that a sex offender is "unable" to exercise volitional control over dangerous sexual behavior before the offender may be committed under the SVPA, a finding not made in his case. He also argued that to meet the Act's clear and convincing evidence standard an offender must be "substantially likely" to re-offend. *IMO Commitment of W.Z., supra,* 339 *N.J.Super.* at 577, 773 *A.*2d 97.

The Appellate Division rejected the contention that substantive due process prohibits the commitment of a sex offender who retains volitional control, but lacks emotional or other control over sexually dangerous behavior. *Id.* at 566, 773 *A.*2d 97. The court stated that, consistent with the Supreme Court's decision in *Kansas v. Hendricks,* 521 *U.S.* 346, 117 *S.Ct.* 2072, 138 *L.Ed.*2d 501 (1997), a sexually violent predator statute will be upheld provided it conditions involuntary commitment on a mental abnormality that results in an inability to control sexually dangerous behavior. *IMO Commitment of W.Z., supra,* 339 *N.J.Super.* at 566, 773 *A.*2d 97. Citing *Hendricks,* the Appellate Division held that involuntary commitment under the SVPA was not limited

only to sex offenders who have a total lack of volitional control over their dangerous sexual behavior. *Id.* at 569, 773 *A.*2d 97.

The Appellate Division also rejected W.Z.'s contention that the clear and convincing burden of proof requires a showing of "substantial likelihood" of commission of a sexual offense under the SVPA. *Id.* at 580, 773 *A.*2d 97. The panel reasoned that to determine whether a person is "likely to engage in acts of sexual violence," the trial court must find clear and convincing evidence that the person has a propensity, inclination, or tendency to commit acts of sexual violence. *Ibid.* After finding clear and convincing evidence of a sex offender's propensity, inclination, or tendency to commit acts of sexual violence, the trial court must then weigh that propensity against the seriousness of the sexual crimes the person has committed to determine the extent of the threat he poses if released. *Ibid.* The panel explained that under that standard, the trial court performs a more "thoughtful analysis" of a person's future dangerousness than that which would be required by adoption of a "substantial likelihood" standard imported from language in the general civil commitment statute. *Ibid.* Applying the requisite analysis, the panel found that the record supported the findings of the experts that W.Z. is "highly likely to engage in violent acts in the future and that using sex as a weapon is part of his regimen." *Id.* at 580–81, 773 *A.*2d 97. The court further concluded that "W.Z. is highly likely to reoffend in the reasonably foreseeable future" and affirmed the trial court's order of commitment under the SVPA. *Id.* at 581, 773 *A.*2d 97.

## II.

W.Z. relied below on *Hendricks* to argue that "a sex offender must be unable to control his dangerousness before he can be committed pursuant to the SVPA." *Id.* at 562, 773 *A.*2d 97. He also cited for support the decision of the Kansas Supreme Court in *In re Crane,* 269 *Kan.* 578, 7 *P.*3d 285 (2000), *cert. granted sub nom., Kansas v. Crane,* 532 *U.S.* 957, 121 *S.Ct.* 1483, 149 *L.Ed.*2d 372 (2001), that interpreted *Hendricks* to impose a requirement of

utter inability to exert volitional control over one's acts in order to commit civilly a sex offender under the Kansas SVPA. *IMO Commitment of W.Z.*, *supra*, 339 *N.J.Super.* at 568–69, 773 *A.*2d 97 (citing *In re Crane*, *supra*, 7 *P.*3d at 289). Although uncontrollable dangerousness is not a stated requirement of our SVPA, W.Z. contended that State and federal substantive due process concepts impose that requirement. *IMO Commitment of W.Z.*, *supra*, 339 *N.J.Super.* at 568–69, 773 *A.*2d 97.

The United States Supreme Court decision in *Crane* has caused W.Z. to alter his argument. W.Z. now contends that the SVPA's "likely to engage in acts of sexual violence" standard does not comply with the holding in *Crane* that permits a state to commit only those individuals who have "serious difficulty in controlling behavior." *Crane*, *supra*, 534 *U.S.* at ——, 122 *S.Ct.* at 870, 151 *L.Ed.*2d at 862. Moreover, he asserts that only those sex offenders who are at risk of specifically committing additional sexual offenses or who have a strong demonstrable preference for sexual offenses may be included in the class of sex offender that a state may seek to civilly commit as a dangerous sexual predator.

The State counters that the SVPA does contain a "control" requirement that is not inconsistent with *Crane*, and further, that W.Z. inappropriately seeks to rewrite the Act to require a finding of compulsive sexual behavior as a condition of commitment. To address these competing arguments, we begin with an examination of the Act's language.

### A.

In enacting the SVPA, the Legislature found that "[c]ertain individuals who commit sex offenses suffer from mental abnormalities or personality disorders which make them likely to engage in repeat acts of predatory sexual violence if not treated." *N.J.S.A.* 30:4–27.25a. The Legislature further found that "[t]he nature of the mental condition from which a sexually violent predator may suffer may not always lend itself to characterization under" existing standards for mental commitment, "although civil commitment

may nonetheless be warranted due to the danger the person may pose to others as a result of the mental condition." *N.J.S.A.* 30:4-27.25b. Accordingly, the Legislature declared that it was modifying the process of civil commitment for sexually violent predators. *N.J.S.A.* 30:4-27.25c.

The SVPA authorizes the Attorney General to initiate a court proceeding for the involuntary commitment of an individual believed to be a "sexually violent predator" as defined by the Act. *N.J.S.A.* 30:4-27.28. Clear and convincing proof is required for commitment. *N.J.S.A.* 30:4-27.32a. The definition of "sexually violent predator" requires proof that the individual has been convicted, adjudicated delinquent or found not guilty by reason of insanity of a "sexually violent offense" (also defined), and "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." *N.J.S.A.* 30:4-27.26. "Mental abnormality" is "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." *Ibid.* The phrase "likely to engage in acts of sexual violence" is defined further to mean that "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." *Ibid.*

The Department of Corrections, made responsible for custody, is required to provide a safe and secure facility to house involuntarily committed sexually violent predators separate from other offenders in the Department's custody. *N.J.S.A.* 30:4-27.34c. While an individual is committed, the Division of Mental Health Services in the Department of Human Services must provide treatment tailored to address the specific needs of sexually violent predators. *N.J.S.A.* 30:4-27.34b. The Act sets up a regime of annual reviews of a committed individual to assess his or her need for continued commitment or conditional discharge. *N.J.S.A.* 30:4-27.35. Further, if at any time during the involuntary commitment the committee's treatment team determines that the

committee is no longer "likely to engage in acts of sexual violence if released," the Act allows the treatment team to recommend to the Department of Human Services that the committee be authorized to petition the court for discharge. *N.J.S.A.* 30:4-27.36.

The Legislature passed the SVPA as part of a package of bills recommended in an October 1997 Report by the Task Force on Treatment of the Criminally Insane. The SVPA is virtually identical to the language of the Kansas SVPA challenged in *Hendricks,* and follows the pattern for such legislation that has been enacted by numerous other states.

### B.

In the first such challenge to reach the United States Supreme Court, the Court in *Hendricks, supra,* upheld the constitutionality of the Kansas Sexually Violent Predator Act (Kansas SVPA or Kansas Act) authorizing the involuntary commitment of dangerous sex offenders. The Kansas SVPA permits involuntary commitment of a person who "suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." *Kan. Stat. Ann.* § 59–29a02(a). It defines "mental abnormality" as a "congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." *Kan. Stat. Ann.* § 59–29a02(b).

In *Hendricks,* the Kansas Act's definition of "mental abnormality" was challenged as violative of substantive due process. *Id.* at 356, 117 *S.Ct.* at 2079, 138 *L.Ed.*2d at 511–12. The Court observed that it has upheld state involuntary commitment statutes when "the confinement takes place pursuant to proper procedures and evidentiary standards;" there is a finding of dangerousness either to oneself or to others; and the proof of dangerousness is coupled with an additional factor, such as "mental illness" or "mental abnormality." *Id.* at 357, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 512. In respect of the third factor, the Court explained that the

requirement of a demonstrable "mental illness" or "mental abnormality" insures that involuntary commitment will be limited "to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* at 358, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 513. The Court interpreted the Kansas Act to require a finding of future dangerousness and a mental abnormality or personality disorder "that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Ibid.* Consequently, the court concluded that the precommitment requirement in the Kansas Act of a "mental abnormality" or a "personality disorder" sufficiently "narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." *Ibid.*

After finding that the Kansas Act satisfied substantive due process, the Court addressed Hendricks' contention that earlier case law dictated that a finding of "mental illness" was required for civil commitment. *Id.* at 358–59, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 513. Hendricks argued that the term "mental abnormality" was not the equivalent of "mental illness" because the term "mental abnormality" was coined by the Kansas legislature and not the psychiatric community. *Ibid.* Rejecting those assertions, the Court noted that the psychiatric community and the Court itself have assigned different meanings to the term "mental illness." *Id.* at 359, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 513. The Court added that "we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislatures the task of defining terms of a medical nature that have legal significance." *Ibid.* The Court noted that Hendricks' admitted lack of volitional control, coupled with predictions by mental health professionals of Hendricks' future dangerousness and their diagnosis of Hendricks as a pedophile "adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Id.* at 360, 117 *S.Ct.* at 2081, 138 *L.Ed.*2d at 514.

In the wake of *Hendricks,* courts in other jurisdictions with similar sexually violent predator statutes have examined their laws and concluded that they satisfy the requirements of substantive due process, each noting their statute's restricted reach to only those sex offenders who lack adequate control over their behavior. *See, e.g., In re Leon G.,* 200 *Ariz.* 298, 26 *P.*3d 481, 484–87 (2001) (rejecting argument that substantive due process mandates separate volitional impairment requirement and holding that SVPA sufficiently narrows class of persons eligible for commitment by linking finding of dangerousness to mental abnormality in conformance with *Hendricks*); *Hubbart v. Superior Ct.,* 19 *Cal.*4th 1138, 81 *Cal.Rptr.*2d 492, 969 *P.*2d 584, 597 (1999) (finding that California statute conforms with *Hendricks* because it establishes connection between volitional control and dangerousness, tying finding of dangerousness to diagnosed mental disorder); *In re Detention of Varner,* 198 *Ill.*2d 78, 259 *Ill.Dec.* 780, 759 *N.E.*2d 560, 564 (2001) (upholding Illinois SVPA that permits commitment without requiring specific finding that sex offender lacks volitional control over sexually violent behavior, reasoning that requirement of "mental disorder" sufficiently narrows class of persons eligible for commitment as required by *Hendricks*); *In re Linehan,* 594 *N.W.*2d 867, 876 (Minn.1999) (concluding that because Minnesota SVPA requires findings of future dangerousness and present disorder or dysfunction that makes it highly likely that individual will recidivate, statute meets *Hendricks'* requirements of some volitional impairment); *In re Detention of Brooks,* 145 *Wash.*2d 275, 36 *P.*3d 1034, 1045 (2001) (rejecting challenge to constitutionality of Washington's SVPA, finding statute to be identical to Kansas' statute).

Unlike the majority of jurisdictions with sexually violent predator statutes that have construed *Hendricks* to require some, but not total, lack of volitional control, the Kansas Supreme Court in *In re Crane,* held that it is unconstitutional to commit involuntarily a sex offender absent a finding that he suffers from a volitional impairment that renders him dangerous beyond his control. *Supra,* 7 *P.*3d at 290. The Kansas court found support in language

from *Hendricks* that referenced civil commitment statutes that required a linkage between dangerousness and an additional factor and stated that " '[t]hese added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.' " *Id.* at 288 (quoting *Hendricks, supra,* 521 *U.S.* at 358, 117 *S.Ct.* at 2072, 138 *L.Ed.*2d at 513). The Kansas court further noted that because Hendricks was diagnosed as a pedophile and admitted that he could not control his behavior, the United States Supreme Court concluded that Hendricks met the Kansas Act's requirements of a finding of dangerousness in conjunction with a mental abnormality or personality disorder that "makes it difficult, if not impossible" to control dangerous sexual behavior. *In re Crane, supra,* 7 *P.*3d at 290 (citing *Hendricks, supra,* 521 *U.S.* at 358, 117 *S.Ct.* at 2072, 138 *L.Ed.*2d at 513). Unlike *Hendricks,* the Kansas court found that Crane suffered from a personality disorder that does not include a loss of volitional control. *In re Crane, supra,* 7 *P.*3d at 290. Because there was no evidence in the record to suggest that Crane was unable to control his dangerous sexual behavior, the court held that Crane's involuntary commitment violated his right to due process. *Ibid.*

The United States Supreme Court granted *certiorari* in *Crane* and its recent decision in that matter has clarified the requirements for civil commitment of sex offenders. In rejecting an interpretation of *Hendricks* that would require a State to prove that a sex offender is completely unable to control his dangerous sexual behavior, the Court nonetheless stated that substantive due process perforce necessitates some lack-of-control determination. *Crane, supra,* 534 *U.S.* at ——, 122 *S.Ct.* at 870, 151 *L.Ed.*2d at 862. Noting the difficulty of demonstrating an "inability to control behavior" with "mathematical precision," the Court held "that there must be proof of serious difficulty in controlling behavior." *Ibid.* In so holding, the Court observed that an "absolutist" approach would not only be "unworkable," but would also risk barring civil commitment of highly dangerous sex offenders suffering from severe mental abnormalities. *Ibid.* Reiterating princi-

ples contained in *Hendricks,* the Court stated that "the psychiatric diagnosis, and the severity of the mental abnormality itself must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Ibid.*

Noting that "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through bright-line rules," the Court acknowledged that "States retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for confinement." *Id.* at ——, 122 *S.Ct.* at 871, 151 *L.Ed.*2d at 863. The Court declined to establish a precise standard for determining the extent to which a sex offender must lack control before he may be found to have "serious difficulty in controlling behavior," leaving the door open for each state to make that determination through an interpretation of its sexually violent predator statute. *Ibid.*

### III.

"[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 *U.S.* 418, 425, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.*2d 323, 330–31 (1979). In an involuntary commitment proceeding an individual's interest in his or her liberty is balanced against well-recognized state interests. A state's legitimate interests and authority in this area arise from two sources: its police power to protect the community at large, and its *parens patriae* power to provide care to its citizens who are unable to care for themselves because of their emotional disorders. *Id.* at 426, 99 *S.Ct.* at 1809, 60 *L.Ed.*2d at 331; *In re D.C.,* 146 *N.J.* 31, 47–48, 679 *A.*2d 634 (1996); *In re S.L.,* 94 *N.J.* 128, 136, 462 *A.*2d 1252 (1983). However, because of the significant restraint on the liberty of a committee, the commitment process is bounded by

constitutional procedural guarantees and the scope of commitment is limited. *Id.* at 137–38, 462 *A.*2d 1252.

In this matter we confront an expansion of the scope of commitment by the Legislature's enactment of the SVPA. The question is whether the Legislature defined the Act's terms in a manner consistent with substantive due process limitations on civil commitment's permissible reach.

We begin our analysis with "the assumption that the Legislature intended to act in a constitutional manner." *Right to Choose v. Byrne,* 91 *N.J.* 287, 311, 450 *A.*2d 925 (1982). Our jurisprudence applies a form of the "constitutional doubt" doctrine. *State v. Johnson,* 166 *N.J.* 523, 540, 766 *A.*2d 1126 (2001). In construing a challenged statute, courts will "seek to avoid a statutory interpretation that might give rise to serious constitutional questions." *Silverman v. Berkson,* 141 *N.J.* 412, 417, 661 *A.*2d 1266 (1995).

## A. *Control*

W.Z. contends that the SVPA does not sufficiently narrow the class of people who may be committed under its terms because it imposes too flexible a requirement for loss of control over one's behavior. Also, although preferring a requirement of a finding of sexual compulsion in order to commit, W.Z. argues that the statute should be interpreted to require minimally a showing that a committee has a strong demonstrable preference for committing sexual offenses when determining his likelihood to recidivate.

The Supreme Court's decision in *Crane* rejected the contention that there must be a showing of complete or total loss of control over one's behavior in order to satisfy substantive due process requirements for a properly circumscribed class of dangerous sex offenders susceptible to involuntary commitment. *Crane, supra,* 534 *U.S.* at ——, 122 *S.Ct.* at 869, 151 *L.Ed.*2d at 861. A finding of mental abnormality that results in an impaired but not a total loss of ability to control sexually dangerous behavior can be sufficient; substantive due process does not require the extreme

finding of a total lack of capacity to control such dangerous behavior. *Crane* described the requisite level of impairment as a "serious difficulty in controlling behavior" and left it to the states to flesh out that concept in their own terms. *Ibid.* We examine the New Jersey version of the SVPA in light of that pronouncement.

Our SVPA is essentially the same as the Kansas statute examined in *Hendricks* in that it "requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." *Hendricks, supra,* 521 *U.S.* at 357, 117 *S.Ct.* at 2080, 138 *L.Ed.*2d at 512. The SVPA authorizes the involuntary commitment of an individual believed to be a "sexually violent predator" as defined by the Act. *N.J.S.A.* 30:4-27.28. The definition of "sexually violent predator" requires proof of past sexually violent behavior through its precondition of a "sexually violent offense" (which, in W.Z.'s case, is not disputed). The present mental condition and required threat of dangerousness are contained in other parts of the Act, including the expanded definitions of the terms in the phrase "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." *N.J.S.A.* 30:4-27.26. We note that the nomenclature of "mental abnormality" or "personality disorder" is not dispositive. What is important is that, like the Kansas statute, the mental condition must affect an individual's ability to control his or her sexually harmful conduct.

As noted, the Act elaborates on key terms within the definition of "sexually violent predator." "Mental abnormality" is "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." *Ibid.* And, the phrase "likely to engage in acts of sexual violence" is defined to mean that the "propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." *Ibid.* Con-

versely, the SVPA sets forth a standard for conditional discharge from involuntary commitment, revealing the level of control the Legislature expected a committed person to demonstrate in order to be released from commitment. To discharge an individual, a court must find that "the person will not be likely to engage in acts of sexual violence because the person is amenable to and *highly likely to comply* with a plan to facilitate the person's adjustment and reintegration into the community. . . ." *N.J.S.A.* 30:4–27.32 c(1) (emphasis added).

Clearly the Legislature intended that there be a "loss of control" requirement in the SVPA. The language of the statute does not impose a requirement of complete loss of control, nor do we require one in passing on this constitutional challenge. Indeed, other than the Kansas Court, all courts that have considered the issue have declined to require a demonstration of an individual's utter lack of control over harmful behavior and instead have required a finding that an individual lacks adequate control over harmful behavior. *See, e.g., Leon G., supra,* 26 *P.*3d at 484–87 (rejecting volitional control requirement, noting "significant problems" in translating medical and psychiatric diagnoses to legal requirements); *In re Detention of Ewoldt,* 634 *N.W.*2d 622, 623–24 (finding that Iowa statute does not require total lack of control determination and declining to adopt respondent's interpretation of *Hendricks* that would require "an extreme lack of volition"). The Supreme Court described the requisite lack of control as a "serious difficulty" standard, a characterization that we interpret as requiring a substantial inability to control conduct. Pursuant to our doctrine of avoiding constructions of our statutes that raise constitutional doubts about their validity, the SVPA must be applied in a manner that satisfies the Court's characterization of the required loss of control. We infer from the Act as a whole a legislative intent to act constitutionally and to apply a standard that would accord with the Court's "serious difficulty" with control over dangerous sexual behavior standard in order for a sex offender to be subject to involuntary commitment.

An inability to control one's sexually violent behavior is the very essence of the SVPA. The Act links a diagnosed mental abnormality or personality disorder to the likelihood of engaging in repeat acts of sexual violence. Inherent in some diagnoses will be sexual compulsivity (i.e., paraphilia). But, the diagnosis of each sexually violent predator susceptible to civil commitment need not include a diagnosis of "sexual compulsion." It is not necessary that the Legislature define its class of targeted individuals by limiting the class to those with identified psychiatric diagnoses containing a finding of sexual compulsion as an element of the diagnosis. See *Hendricks, supra,* 521 *U.S.* at 359, 117 *S.Ct.* at 2081, 138 *L.Ed.*2d at 513 ("[W]e have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes."). Medical terminology need not circumscribe precisely the drafting of legislation intended to impose legal consequences for dangerous behavior. It is sufficient for the Legislature to confine its targeted class of sex offenders subject to civil commitment because of their dangerousness by identifying the degree of lack of control that each must exhibit, tied to a finding of mental abnormality or illness. The Legislature's use of the adjectives "volitional," "emotional," or "cognitive" when describing the reasons for an individual's serious difficulty with control over his or her behavior indicates that the Legislature intended to insure that every individual who has a substantial inability to exercise control over sexually violent behavior would be within the Act's reach. As noted by the Illinois Supreme Court when addressing similar language in the Illinois SVPA:

Medical science's understanding of mental pathology is imperfect and evolving, and the legislature used these terms simply to insure that everyone who is unable to control his or her sexually violent behavior is covered by the law, whatever the precise reason for that lack of control might be.

[*Varner, supra,* 259 *Ill.Dec.* 780, 759 *N.E.*2d at 565.]

In addition, to be within the class of persons who may be committed under the SVPA, one must be "likely to engage in acts of sexual violence." That aspect of the "dangerousness" prong of the Act is explained to mean that "the propensity of a

person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." One's likelihood to commit such acts obviously relates to the control determination that the trial court must make. Although the "likelihood" requirement is not defined further in the Act, we import into that analysis the "serious difficulty" standard. An individual may be considered to pose a threat to the health and safety of others if he or she were found, by clear and convincing evidence, to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend.

Although worded differently, the SVPA suggests a similar analysis in its expression of the standard for safely releasing a committed sexual predator to the community. *N.J.S.A.* 30:4–27.32c(1) states that a court could find a committee "not likely" to engage in acts of sexual violence, and authorizes conditional release of such a person upon a finding that "the person is amenable to and *highly likely to comply* with a plan to facilitate the person's adjustment and reintegration into the community." *N.J.S.A.* 30:4–27.32c(1) (emphasis added). We regard that language as the other side of this coin. It supports our understanding of the Act's requirements, namely that commitment is appropriate for an individual who is "highly likely" not to control his or her sexually violent behavior. Once committed under the SVPA, an individual should be released when a court is convinced that he or she will not have serious difficulty controlling sexually violent behavior and will be highly likely to comply with the plan for safe reintegration into the community. The constitutional preference for committing only those who have serious difficulty controlling their sexually dangerous behaviors serves as an identifying line between those who should be released upon completion of their sentences for sexually violent offenses and those who pose a level of danger to the health and safety of others sufficient to warrant that they be involuntarily committed under the SVPA for care, treatment, and custody.

### B. *Temporal Context*

In determining his likelihood "to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment," W.Z. urges this Court to require the State to prove that it is substantially likely that the acts would occur within the reasonably foreseeable future. The courts below held that to be committed an individual must be determined to be likely to engage in acts of sexual violence in the *reasonably foreseeable future*, employing a sensible temporal context to the threat of harm posed by the sex offender. See *IMO Commitment of W.Z., supra,* 339 *N.J.Super.* at 574–75, 773 *A.*2d 97.

However, the trial court explained the "likely" standard in the phrase "likely to engage in acts of sexual violence" as if comparable to a preponderance, or fifty-one percent chance of probability, and the Appellate Division accepted that explanation, although with additional explication. *Id.* at 578–80, 773 *A.*2d 97 (explaining that court must find by clear and convincing evidence that person has "a propensity, inclination or tendency, to commit acts of sexual violence" and must establish by clear and convincing evidence "the degree of such a propensity"). The Appellate Division rejected W.Z.'s argument that the State must prove that an individual is "*substantially likely* to engage in acts of sexual violence" in order to satisfy the clear and convincing burden of proof required for commitment under the SVPA. *Id.* at 580, 773 *A.*2d 97. The court viewed the two concepts probability of reoffending and burden of proof—as distinct, stating that they can coexist and operate independently. *Id.* at 579, 773 *A.*2d 97.

That they are distinct is correct. The clear and convincing burden of proof required in any civil commitment matter applies to all trial court findings. That does not mean that in explaining the degree of likelihood of future dangerousness, the Act's burden of proof terminology controls the substance of the required finding. A difficulty arises here because the courts below linked the probability of reoffending to a description that suggests a quantum of proof, calling it a preponderance, or a more than fifty-

percent chance. Those descriptions can cause confusion where the parties must present and the trial court must evaluate difficult, nuanced medical evidence and reduce it to specific findings affecting a person's liberty.

Predictions of future dangerousness have been for some time a permitted basis for restriction of a citizen's liberty when that dangerousness is tethered to a finding of mental illness or abnormality. *Hubbart, supra,* 81 *Cal.Rptr.*2d 492, 969 *P.*2d at 600 n. 26 (noting that United States Supreme Court has long upheld civil commitment statutes "where dangerousness is expressed in terms of a 'probability,' 'threat,' or similar risk that a person who is presently mentally disturbed will inflict harm upon himself or others in the future if not confined" (citations omitted)). However, we can and must attempt to be as precise as possible when describing the required level of likelihood of that harmful behavior.

Because we see no basis for separating the court's determination of a person's likelihood to engage in acts of sexual violence from the court's assessment of the person's loss of control over his or her harmful behavior specifically, we are persuaded that we should construe the term "likely to engage in acts of sexual violence" in light of the constitutionally required standard for loss of control. To be committed under the SVPA an individual must be proven to be a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts. Pursuant to our holding today, the State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend.

Those findings incorporate a temporal sense that will require an assessment of the reasonably foreseeable future. No more specific finding concerning precisely when an individual will recidivate need be made by the trial court. Commitment is based on the individual's danger to self and others because of his or her *present*

serious difficulty with control over dangerous sexual behavior. The Act requires annual court review hearings on the need for continued involuntary commitment. Those periodic reviews will allow adequate opportunity to assess fresh information concerning the committee's dangerousness. See *In re Ewoldt*, 634 *N.W.*2d 622, 624 (Iowa 2001) (holding that Iowa SVPA's provision of annual periodic reviews for committees does not suggest that upon initial commitment State must prove that risk of reoffense would otherwise occur within one year).

### C. *Use of Actuarial Instruments*

W.Z. also challenges the use of actuarial instruments developed to assess a sex offender's risk of reoffense by comparing him or her to the risk characteristics of groups of other sex offenders monitored for recidivism. He contends that those predictions of an individual's risk group were not the equivalent of an assessment of his particular risk of reoffense.

W.Z.'s argument is the same as that addressed in the companion case, *IMO Commitment of R.S.*, 339 *N.J.Super.* 507, 511, 773 *A.*2d 72 (App.Div.2001), also decided today. Our holding in *R.S.*, permitting the use of such instruments by experts testifying in commitment hearings, requires that we reject W.Z.'s contentions concerning the unreliability of those actuarial instruments. *Ibid.* Accordingly, W.Z.'s final contention is without merit.

### IV.

 As modified, the judgment of the Appellate Division is affirmed. The SVPA is not violative of substantive due process provided that the findings to support an individual's civil commitment under the Act comport with the requirements of this opinion. We remand this matter to the trial court for further proceedings in light of the additional requirement that to support involuntary commitment of a sex offender under the SVPA, the State must prove by clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or

her sexually violent behavior and will reoffend. Because that standard had not been expressed by the Supreme Court in *Crane*, or by us, at the time of W.Z.'s commitment hearing, we must remand to the trial court for a determination of whether W.Z.'s mental condition causes the required degree of inability to control sexually violent behavior to justify his commitment under the SVPA.

*For affirmance as modified*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA and ZAZZALI—6.

*Opposed*—None.