# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5565-17T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF T.L.,
SVP-774-17.

_____

Submitted June 6, 2019 – Decided July 10, 2019

Before Judges Simonelli and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-774-17.

Joseph E. Krakora, Public Defender, attorney for appellant T.L. (Susan Remis Silver, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent State of New Jersey (Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen J. Slocum, Deputy Attorney General, on the brief).

PER CURIAM

Appellant T.L., who is now forty-seven years old, appeals from a June 25, 2018 judgment continuing his involuntary commitment to the Special Treatment

Unit (STU) as a sexually violent predator pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm.

I.

We need not recount in substantial detail T.L.'s prior criminal history, which dates back to 1998. In sum, T.L. has an extensive criminal history consisting of sexual and non-sexual offenses. In October 1998, T.L. pled guilty to endangering the welfare of a child, N.J.S.A. 2C:24-4, after police found him in bed with a fourteen-year-old missing boy, A.A.,[1] both in their underwear. T.L. denied any sexual contact with A.A. After A.A. initially denied that T.L. had sexual contact with him, A.A. later changed his story and stated he awoke with T.L. lying on top of him, and another time, A.A. awoke with pain in his buttocks. The police also found sixty-three bags of cocaine, a book on sexual behavior, and baby oil.

On November 4, 2002, T.L. pled guilty to first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), while on probation.[2] His conviction was predicated on the following facts. On July 30, 2001, a thirteen-year-old

---

[1] We use initials to protect the confidentiality of the child victims pursuant to N.J.S.A. 2A:82-46 and Rule 1:38-3(c)(9).

[2] The disposition was later amended for sentencing under second-degree aggravated sexual assault, N.J.S.A. 2C:14-2(c).

developmentally disabled boy, J.C., reported to police that T.L. sexually penetrated him against his will after T.L. intoxicated J.C. with alcohol and marijuana. T.L. admitted to penetrating J.C. and performing oral sex with him, knowing that the boy was underage and T.L. admittedly "took advantage of him." During his second plea allocation, T.L. testified that he knew J.C. was developmentally disabled, T.L. anally penetrated him, and ejaculated while J.C. was unconscious.

T.L. was sentenced to an eight-year prison term subject to an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant was also subject to community supervision for life (CSL), N.J.S.A. 2C:43-6.4, and the requirements imposed by Megan's Law; N.J.S.A. 2C:7-1 to -11. T.L. was incarcerated at the Adult Diagnostic Treatment Center (ADTC) and released in 2008. In 2011, T.L. violated his CSL by possessing a computer, and in October 2015, he committed another CSL violation by creating a Facebook account on his computer under an alias, which stored photographs and videos of minors. T.L. also possessed a smartphone and a laptop containing photographs of T.L. with under aged children during a trip to Six Flags Great Adventure in violation of his CSL, which provided he was not to have unsupervised contact with minors. He pled guilty to a violation of

knowingly creating the Facebook account. He was also non-compliant with his CSL terms because he only attended sixty-percent of his outpatient sex offender treatment sessions.

On January 7, 2016, T.L. again violated his CSL terms by possessing alcohol, and violating his curfew by leaving his home at 1:24 a.m. for a sexual encounter arranged through a cellular phone application. While searching T.L.'s residence at this time, a fifteen-year-old boy appeared and told police he was there to "chill" with T.L., and that the minor did so frequently.

On August 17, 2016, during a home visit, T.L.'s parole officer found children's underwear, clothing, marijuana, and several cellular phones. Teenage brothers, ages twelve and fourteen, advised police they were alone with T.L. at his home and T.L. told them to jump over the fence when his parole officer arrived.

On September 8, 2017, the State filed a petition to commit T.L. under the SVPA. At the hearing, the State presented the testimony of Dr. Roger Harris as an expert in psychiatry. The State also presented the testimony of Dr. Zachary Yeoman, a psychologist; Heather Burnett, T.L.'s outpatient sex offender therapist; and senior parole officers Shaun Savarese and Thawra Naser. T.L. presented Dr. Timothy Foley, a psychologist, as his expert witness.

Harris administered the Static-99R actuarial instrument to assess T.L.'s future sex offender risk and Harris scored T.L. a four, placing him in the above-average risk category. In his opinion, Harris concluded T.L. admitted to "sexual fantasies about sex with, quote, people who are unconscious and can't resist," this being "a long fantasy he has held from a young age through adulthood." Harris testified that T.L. suffered from paraphilic disorder, antisocial personality disorder, and various substance abuse disorders. Despite T.L. claiming he was no longer sexually attracted to teenage boys, Harris stated, T.L.'s "deviant arousal, his antisocial attitudes and behaviors, his repeated failed supervision, his violation of probation, his using sex for coping, his poor self[-]regulation, his poor problem solving, [and] his . . . impulsive lifestyle" meets the criteria under the SVPA.

Yeoman gave similar testimony. He also diagnosed T.L. with paraphilic disorder, antisocial personality disorder, and multiple substance use disorders and opined that these disorders do not spontaneously remit. By internalizing treatment, Yeoman opined that T.L. can't learn to control his sexually violent tendencies because T.L. lacks a sufficient understanding of relapse prevention. Because T.L. continued to engage teenage boys after being sanctioned, Yeoman concluded T.L.'s treatment had a poor effect on him. Yeoman administered the

Static-99R and the Stable-2007 tool to T.L., which revealed, "[h]is most concerning dynamic risk factors were his deviant sexual preference, sexual preoccupation, capacity for relationship stability, poor problem solving and difficulties with cooperating with supervision," along with "impulsivity and use of sex as coping."

Burnett provided T.L. with outpatient sex offender treatment from March 2014 through December 2016. Weekly attendance was a condition of T.L.'s CSL but he was non-compliant, attending seventy-eight out of 130 sessions, made "very little progress," and Burnett identified T.L. as high risk to offend requiring "the highest and most intense amount of treatment."

Savarese testified he was T.L.'s parole officer in 2015 when T.L. was investigated for his illicit Facebook account, and Savarese recovered multiple electronic devices from T.L.'s home with images and videos of himself with minor children. On January 7, 2016, Savarese was present when minor N.T. came to T.L.'s residence alone looking to spend time with him after absconding from school that day.

Naser was T.L.'s parole officer with respect to his January 7, 2016 CSL violation. Naser confirmed he was at T.L.'s residence in August 2016 when T.L. told two partially clothed minor boys to jump over his fence to avoid being seen

6

when the officer appeared. Naser found a pair of children's underwear in T.L.'s residence, electronic devices, and marijuana. She observed twelve-year-old N.T. retrieve his shoes from T.L.'s residence.

In rebuttal, Foley testified that he did not consider T.L.'s 1998 offense sexual in nature and viewed T.L.'s CSL violations as limited to possessing disallowed electronics. Explaining his opinions, Foley conceded T.L. "really didn't participate in treatment" at the ADTC, and he characterized T.L.'s participation in outpatient treatment with Burnett as "dismal," and T.L. "really didn't do very much with it." Notably, Foley stated that successfully completing treatment would "reduc[e] [T.L.'s] risk to some degree[,]" but opined treatment has a limited effect on recidivism rates. Nevertheless, Foley recommended that T.L. be closely supervised and have no contact with minors.

Foley diagnosed T.L. with somnophilia, "sexual attraction to people who are incapacitated or asleep." In contrast to Harris, Foley declined to diagnose T.L. with antisocial personality disorder because he lacked documentation that T.L.'s alleged antisocial behaviors began before the age of fifteen. Foley did not diagnose paraphilic disorder because he considers sexual attraction to teenagers as not being a common occurrence.

A-5565-17T5

Based on the State's proofs, the judge found by clear and convincing evidence Harris's testimony "very credible" and "very thorough," and Burnett "to be very credible in terms of her interest and demeanor." The judge found Foley "credible" but stated, "I don't agree with him." The judge ruled the

> [r]ecord is clear [T.L.] had contact with teenagers. And I find Dr. Harris credible again. So, I find that although [T.L.] has . . . limited sexual criminal convictions, that he basically had gone to the ADTC and not done that well and he's continued to have this contact with young boys. That numerous times he was found with photos of young boys with his presence. Presence of alcohol in his home. Games. Also to paraphernalia.
>
> When parole went there, there were these young boys coming to the -- that came to the house or left the house. And he's been admonished to stay away from having unsupervised contact with -- with boys and he's continued to do that.
>
> So I find that -- that he -- there's clear and convincing evidence he's been convicted of a sexually violent offense, clear and convincing evidence he continues to suffer from a mental abnormality and personality disorder that does not spontaneously remit, paraphilia, antisocial personality disorder, which affect him emotionally, cognitively, volitionally, causing him to have serious difficulty controlling his sexually violent behavior, violence. He's highly likely by clear and convincing evidence to sexually reoffend. And that's presently highly likely to sexually reoffend and that this has been [g]oing on for a number of years.
>
> And the -- the various treatment at ADTC, the various treatment hasn't been met. The various supervision he's

had with parole officers over years he continues to have this interest in contact with -- unsupervised contact with children and it makes him to be highly likely to sexually reoffend.[3]

On appeal, T.L. argues:

POINT I.

THIS COURT MUST REVERSE T.L.'S COMMITMENT ORDER SINCE THE ORDER WAS BASED ON INADMISSIBLE AND UNRELIABLE HEARSAY.

A. The Trial Court Relied on Hearsay When It Found T.L.'s Endangering Offense from 1998 to Be "Sexual in Nature."

B. The Trial Court Improperly Relied on Hearsay When It Found T.L. Gave Alcohol and Had Sexual Contact with A.A.

C. The Trial Court Relied on Hearsay When It Found that T.L. Incapacitated J.C. with Alcohol and Drugs.

D. The Trial Court Relied on Hearsay When It Said T.L. Violated CSL By Giving Drugs or Alcohol to Minors.

E. The Trial Court Relied on Hearsay Allegations When It Found that T.L. Recruited Minors for Sexual Contact.

---

[3] The judge initially issued his oral decision on June 18, 2018, but the transcript was unavailable. On October 10, 2018, we granted T.L.'s motion for a temporary remand to reconstruct the June 18, 2018 record, and the judge gave his oral decision again on October 19, 2018.

F. The Trial Court Relied on Hearsay When the Record Contains No Evidence T.L. Had Any Unsupervised Contact with Minors Since His Only Sex Offense in 2001.

POINT II.

THE STATE DOCTORS' TESTIMONY LACKED AN EMPIRICAL BASIS AND CONSTITUTED INADMISSIBLE NET OPINION.

After a careful review of the record, we find these arguments lack merit.

II.

Our scope of review of judgments in SVPA commitment cases is "extremely narrow." In re Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). "We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Accordingly, an appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). "So long as the trial court's findings are supported by

'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162).

"The SVPA authorizes the involuntary commitment of an individual believed to be a 'sexually violent predator' as defined by the Act." In re Commitment of W.Z., 173 N.J. 109, 127 (2002) (quoting N.J.S.A. 30:4-27.28). "The definition of 'sexually violent predator' requires proof of past sexually violent behavior through its precondition of a 'sexually violent offense. . . .'" Ibid. It also requires that the person "suffer[] from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." Ibid. (quoting N.J.S.A. 30:4-27.26).

"[T]he mental condition must affect an individual's ability to control his or her sexually harmful conduct." Ibid. "Inherent in some diagnoses will be sexual compulsivity (i.e., paraphilia). But, the diagnosis of each sexually violent predator susceptible to civil commitment need not include a diagnosis of 'sexual compulsion.'" Id. at 129.

After reviewing the record in light of the contentions raised on appeal, we affirm substantially for the reasons stated by the judge in his comprehensive oral decision. We add only the following.

A-5565-17T5

T.L. has previously been determined to be a "sexually violent predator" as defined by N.J.S.A. 30:4-27.26, based upon his conviction for a predicate offense as defined by the SVPA. T.L. pled guilty to first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), the predicate offense that led to his initial confinement in the STU in 2002.

T.L. contends the State's experts accepted as true, as did the judge, the hearsay reports that T.L. had unsupervised interactions with teenage boys after his release from the ADTC, was photographed with young boys, and had alcohol in his home. The record belies the assertion the judge considered the evidence for its truth. All three experts testified the sources they reviewed are the type customarily relied upon by experts in their fields of expertise. T.L. argues the judge relied on hearsay by characterizing T.L.'s endangerment offense in 1998 to be "sexual in nature." But the judge expressly relied upon the 2002 sex offense conviction and allowed T.L.'s prior history only for the limited purpose of establishing T.L.'s diagnoses. The same holds true for T.L.'s claims that the judge erroneously relied upon information about T.L. providing alcohol and having sexual contact with A.A., incapacitating J.C. with alcohol and drugs, violating the CSL by recruiting minors for sex, and having unsupervised contact with minors.

The facts or data upon which an expert bases an opinion need not be admissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" N.J.R.E. 703. In In re Commitment of J.M.B., 197 N.J. 563, 597-98 n.9 (2009), our Supreme Court noted with approval the "use of police reports, presentence reports and prior psychiatric evaluations" to, among other things, "evaluate the opinions of the testifying experts who considered these documents in reaching their diagnoses." The Court stated: "In respect of the commitment court's findings about J.M.B.'s current mental condition and whether he had demonstrated inability to adequately control his sexually harmful conduct, we likewise affirm the trial court's reliance on the experts' opinions, which were based on a broad array of evidence about J.M.B." Id. at 598 n.9; accord In re Civil Commitment of W.X.C., 407 N.J. Super. 619, 641 (App. Div. 2009) (explaining that the trial court properly considered, as background in evaluating the opinions of experts, the experts' reliance "on reports concerning W.X.C.'s mental health, his criminal history, police reports, and clinical tests"), aff'd on other grounds, 204 N.J. 179 (2010).

It is a "well-established principle that '[e]videntiary decisions are reviewed under the abuse of discretion standard because, from its genesis, the

decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (alteration in original) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). We find no abuse of discretion with the judge's decision to admit the hearsay evidence for the limited purpose it was used here.

III.

T.L. next argues that the State's experts' testimony lacked an empirical basis and amounted to inadmissible net opinions, leaving T.L. "indefinitely committed based on unfounded assumptions about his diagnoses and risk." We disagree.

"An expert may not provide an opinion at trial that constitutes 'mere net opinion.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). The net opinion rule bars admission "of an expert's conclusions that are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). The expert must provide the factual basis and analysis that support the opinion, rather than stating a mere conclusion. Davis, 219 N.J. at 410. Courts "may not rely

on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." Ibid. (quoting Pomerantz Paper Corp., 207 N.J. at 373).

The net opinion rule does not require experts to organize or support their opinions in a specific manner "that opposing counsel deems preferable." Townsend, 221 N.J. at 54. Consequently, "[a]n expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Ibid. (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). An "expert's failure 'to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion.'" Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)). Instead, such omissions may be subjected to exploration and searching cross-examination at trial. Id. at 54-55.

The net opinion doctrine requires experts to "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are [scientifically] reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

Trial courts perform their "gatekeeping role" to assure reliability of expert scientific testimony by requiring experts "to demonstrate" they applied "scientifically recognized methodology in the way that others in the field practice the methodology." In re Accutane Litig., 234 N.J. 340, 399-400 (2018). Thus, when "a proponent does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community, the gatekeeper should exclude the proposed expert testimony on the basis that it is unreliable." Id. at 400.

T.L. contends the State cannot support his commitment unless it proves by "clear and convincing evidence" that he has a "mental abnormality or personality disorder" that makes him "highly likely to sexually reoffend." T.L. argues the State can only make this showing by proving he has hebephilia[4] because "this is the only mental abnormality or personality disorder the State[s'] experts diagnosed . . . said predisposed him to commit acts of sexual violence."

---

[4] "The term 'hebephilia' describes the sexual preference for minors at an early pubertal body age. For most clinicians the definition of hebephilia is not obvious and not integrated as a separate category in the DSM-5." Klaus M. Beier, Hebephilia as a Sexual Disorder, Fortschritte Der Neurologie Psychiatrie, https://scinapse.io/papers/2005815474 (last visited June 20, 2019).

The record is replete with examples from the States' experts concluding that T.L. had the requisite mental abnormality or personality disorder, rendering him highly likely to sexually reoffend. Both Harris and Yeoman diagnosed T.L. with other specified paraphilic disorder and antisocial personality disorder. T.L. himself has admitted his sexual compulsion towards intoxicated, unconscious, and unable-to-consent teenage boys, and the States' experts confirmed these compulsions have not diminished with age, as they normally do.

T.L. argues Harris's point that antisocial personality disorder "doesn't directly predispose an individual to sexually reoffend," and only T.L.'s alcohol and drug disorders, working in tandem with his personality disorders, would increase his risk of reoffending. T.L. also notes "hebephilia" was rejected from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders

(DSM)[5] citing Foley's testimony that, hebephilia is "not a sexual deviancy," and "[t]here's nothing rare about adults being attracted to teenagers."[6]

Further, the Static-99R actuarial instrument administered to T.L. is an "assessment tool[] . . . based upon static factors, which are elements of a person's history which cannot be changed, as opposed to dynamic factors, which are elements which can be modified over time." In re Civil Commitment of A.Y., 458 N.J. Super. 147, 171 (App. Div. 2019) (quoting In re J.P., 339 N.J. Super 443, 451 (App. Div. 2001)). In A.Y., we recently held: "The Static-99R is used

_____

[5]

> The [DSM] is the handbook used by health care professionals in the United States and much of the world as the authoritative guide to the diagnosis of mental disorders. DSM contains descriptions, symptoms, and other criteria for diagnosing mental disorders. It provides a common language for clinicians to communicate about their patients and establishes consistent and reliable diagnoses that can be used in the research of mental disorders.
>
> [DSM-5: Frequently Asked Questions, American Psychiatric Association, https://www.psychiatry.org/psychiatrists/practice/dsm/feedback-and-questions/frequently-asked-questions, (last visited June 20, 2019).]

[6] There is some debate within the psychological community about the appropriateness of classifying hebephilia as a mental abnormality—hence the reason it does not appear in the DSM-5.

to predict sexual recidivism." Ibid. T.L. was also administered the Stable-2007 tool. Our Supreme Court noted scientific research has demonstrated "the use of actuarial concrete predictors is at least as good, if not in most cases better, in terms of reliability and predictability than clinical interviews." In re Registrant, C.A., 146 N.J. 71, 106 (1996). As in A.Y., we conclude that the methodology employed by the States' experts satisfied the requirements pronounced by our Supreme Court in Accutane, and did not constitute a net opinion.

"Mental abnormality" is defined as "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." N.J.S.A. 30:4-27.26. The phrase "likely to engage in acts of sexual violence" is defined further to mean "the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." N.J.S.A. 30:4-27.26.

In W.Z., the committed individual was diagnosed with antisocial personality disorder, alcohol abuse, and intermittent explosive disorder. 173 N.J. at 116-17. Our Supreme Court affirmed the rejection of W.Z.'s argument that the SVPA did not apply to him because he was not diagnosed with an Axis I sexual compulsion or paraphilia. Id. at 116. Therefore, whether or not a mental

19

abnormality is listed in DSM-5 is irrelevant vis-a-vis a finding that the mental abnormality satisfies the States' burden under the SVPA.

The judge's decision commands the special deference afforded to specialist judges who hear SVPA cases. We are satisfied the judge's judgment for commitment is both adequately supported by sufficient credible evidence in the record and consistent with controlling legal principles. There is no basis for reversal on this record.

T.L.'s remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION