# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5233-16T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF R.E.B., SVP-367-04.

_____

Argued March 22, 2018 — Decided July 5, 2018

Before Judges Haas and Gooden Brown.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Docket No. SVP-
364-04.

Joan D. Van Pelt, Designated Counsel, argued
the cause for appellant R.E.B. (Joseph E.
Krakora, Public Defender, attorney).

Stephen J. Slocum, Assistant Attorney General,
argued the cause for respondent State of New
Jersey (Gurbir S. Grewal, Attorney General,
attorney).

PER CURIAM

R.E.B. appeals from the June 7, 2017 order of the Law Division continuing his commitment to the Special Treatment Unit (STU), the secure facility designated for the custody, care, and treatment of sexually violent predators, pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. For the reasons that follow, we affirm.

We need not recount R.E.B.'s prior criminal history or the events that followed his original admission to the STU in 2004. They are recounted at length in our prior opinions, In re Civil Commitment of R.Z.B.,[1] 392 N.J. Super. 22 (App. Div. 2007), In re Civil Commitment of R.E.B., No. A-3270-12 (App. Div. Nov. 25, 2013), and In re Civil Commitment of R.E.B., No. A-1613-11 (App. Div. May 20, 2014). Suffice it to say that R.E.B., born in October 1948, has an extensive criminal history in both state and federal courts, including three separate instances of sexual offenses against minors dating back to the early 1980s and spanning twelve years. His convictions include sexual assault as well as the production, possession, and sale of child pornography. His last conviction occurred in 1995, and in 2005, he was committed to the STU under the SVPA on parole violations following his release from federal custody.

At the civil commitment review hearing before Judge James F. Mulvihill on May 18 and May 31, 2017, the State presented expert testimony from psychiatrist Michal Kunz, M.D., and psychologist Debra L. Roquet, Psy. D. R.E.B. presented the expert testimony of psychologist Gianni Pirelli, Ph. D. The experts' reports,

---

[1] R.E.B. is referenced as "R.Z.B." in the 2007 appeal.

various treatment notes, and other records were also admitted into evidence.

After interviewing R.E.B. on May 4, 2017, and reviewing his previous psychiatric evaluations, STU treatment records, prison and police records, Dr. Kunz concluded that R.E.B. met the criteria of a sexually violent predator and was highly likely to engage in acts of sexual violence in the foreseeable future. Based on R.E.B.'s sexual arousal from pre-, peri-, and post-pubescent males between the ages of nine and eighteen, Dr. Kunz diagnosed R.E.B. with "pedophilic disorder, sexually attracted to male[s], non-exclusive"; "other specified paraphilic disorder with a focus on teenagers, . . . sometimes referred to as hebephilia"; and "other . . . specified personality disorder with antisocial and narcissistic traits." According to Dr. Kunz, these disorders do not spontaneously remit and affect R.E.B. "predominantly in the . . . cognitive sphere of his ability to . . . recognize his feelings," making him predisposed to sexually reoffend. Dr. Kunz acknowledged that treatment could control the impulses these disorders cause, but, in his opinion, R.E.B. had not had enough treatment to adequately control his impulses if released at this time.

Dr. Kunz noted that R.E.B.'s "sexual offending history" showed an "escalation," beginning "with two boys whom he just

3

encountered in the street," progressing to "him actually bringing . . . victims into his home," and ultimately evolving into "this elaborate well-organized effort to lure a number of boys into the residence by a variety of activities . . . that [were] likely to entice boys." Dr. Kunz observed that R.E.B.'s offense history showed "a really strong sexually deviant attraction to boys" that he maintained and acted on "despite punishment." Dr. Kunz also noted that R.E.B.'s "deceitful" and "sophisticated" manner of grooming and gaining access to the victims was "consistent[] with his personality structure."

Although R.E.B.'s most recent PCL-R[2] score was 24.2, which was at the high end of the moderate range for psychopathic deviance, given his prior higher scores, Dr. Kunz was still of the opinion that R.E.B.'s history of antisocial behaviors corresponded with his antisocial personality characteristics and was indicative of psychopathic traits. Dr. Kunz noted that R.E.B. passed his most recent Deviant Arousal Polygraph Examination, and that

---

[2] According to Dr. Kunz, the PCL-R, or psychopathy checklist revised, provides a dimensional score that represents the extent to which an individual is judged to match the prototypical psychopath. Higher scores indicate a closer match and, presumably, a greater confidence that the individual is a psychopath. An individual who receives a score of thirty or above meets the diagnostic criteria for psychopathy. Previously, R.E.B. had scores of 29.5 and 30.5.

A-5233-16T5

despite reporting being aroused by teen and adult males, he showed no arousal to any deviant or non-deviant stimuli during a 2016 penile plethysmograph (PPG).[3]  However, Dr. Kunz pointed out that the test results were not valid because R.E.B. described the "setup" as "creepy," resulting in the suppression of "whatever sexual arousal there may have been."

As to his intellectual and educational background, R.E.B.'s IQ score was in the superior range, and Dr. Kunz confirmed that R.E.B. had a Bachelor's degree in Psychology from New York University.  As to substance abuse history, R.E.B. had "some history of marijuana abuse," but Dr. Kunz did not "find a persistent pattern" to make "it particularly significant."

Dr. Kunz gave R.E.B. a Static-99R[4] score of three, indicating an average risk for re-offense.  However, in classifying R.E.B.'s

_____

[3]  According to Dr. Kunz, a PPG is a test to determine a person's arousal whereby "a device is placed on a person's penis," and then the person is "exposed to . . . sexually arousing stimuli," and "the device measures the arousal by . . . measuring the changes in the . . . circumference of the penis."

[4]  "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014) (citing Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003)).  Our Supreme Court "has explained that actuarial information, including the Static-99, is 'simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA.'"  Ibid. (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)).

risk to sexually reoffend in the foreseeable future as "high," Dr. Kunz considered other dynamic risk factors such as R.E.B.'s: "[s]exual preference for children"; "psychopathy"; "lack of concern for others"; "intimacy deficits"; "emotional identification with children"; reliance on sex as a coping mechanism; "attitudes tolerant of sexual assault"; "dropping out of [past] sexual offender treatment"; "violation of [parole]"; and "cooperation with supervision."

Dr. Kunz "consider[ed] mitigating factors in three areas, namely age, disabling medical conditions and treatment." However, inasmuch as R.E.B.'s offenses did not involve physical force, Dr. Kunz did not believe that R.E.B.'s current age of sixty-eight would "impede . . . his ability to access[,] . . . groom[,] or manipulate his victims." In addition, Dr. Kunz found R.E.B. was "fit and healthy in spite of the fact that he suffered a heart attack" in 2011, which resulted in the placement of several stents. Further, Dr. Kunz noted that while R.E.B. "has made progress in treatment[,] . . . he still need[ed] to work more in treatment to fully mitigate his risk."

Dr. Kunz recounted R.E.B.'s treatment prior to coming to the STU as well as his treatment progress at the STU. Prior to arriving at the STU, R.E.B. received sex offender treatment on three different occasions. Despite receiving treatment, he

continued to "pursue[] his deviant sexual interests," which Dr. Kunz interpreted as a sign of "the strength of his sexual arousal as well as the sort of resistance to interventions that could help him reduce his risk to reoffend." Although R.E.B. had entered the second half of the more advanced part of the core phase of treatment at the STU and despite his intelligence and education level, Dr. Kunz opined that R.E.B.'s treatment progress had been hampered by "his personality traits" that "continue to . . . create risk[s] for him" and "interfere with his treatment and his ability to engage in treatment." As a result, the treatment has not had "the desired effect."

Specifically, Dr. Kunz explained that repeated themes in the treatment team reports showed that R.E.B. did not demonstrate a full command over his sexual assault cycle, had "interpersonal problems" with other residents, and became "defensive" when "given feedback by his peers or by his treaters." Dr. Kunz found this significant because R.E.B. would have to rely on his peers and treaters once discharged and would therefore have to find a way "to interact" without this "ongoing" antagonism. As to R.E.B.'s understanding of his sexual assault cycle, Dr. Kunz explained that, for a long time, R.E.B. would not "acknowledge" his "arousal to underage individuals" and had "interpret[ed] his arousal to teenagers as essentially stemming from his . . . internal conflict

over his homosexuality." Dr. Kunz again attributed R.E.B.'s resistance to "his personality traits," and to his "rigidity" or "difficulty" recognizing his feelings.

Dr. Roquet, a member of the STU's Treatment Progress Review Committee (TPRC), conducted an annual review of R.E.B.'s progress in treatment by interviewing R.E.B. and reviewing the prior treatment notes and reports. Dr. Roquet agreed with Dr. Kunz's diagnosis and concluded that R.E.B. suffered from a mental abnormality or personality disorder that predisposed him to sexually reoffending. She characterized R.E.B. as "highly likely to sexually reoffend" in the foreseeable future "without a high level of external controls." Dr. Roquet opined that R.E.B. required continued "confinement to the STU in order to mitigate that risk."

Referring to R.E.B.'s PCL-R and Static99-R scores to which Dr. Kunz had previously testified,[5] Dr. Roquet elaborated that "the primary concern" was R.E.B.'s "sexual pathology," which was

---

[5] Dr. Roquet also administered the Stable-2007, a risk assessment instrument "developed to assess change in intermediate term risk status, [and] assessment needs, and [to] help predict recidivism in sexual offenders." R.E.B.'s Stable-2007 score was "[twelve] out of a possible [twenty-six] points," which was a "high" score for the presence of dynamic factors associated with recidivism. Together, the Stable-2007 and the Static-99R "provide [a] composite assessment of [R.E.B.'s] risk/needs," and "place[d] him in the [m]oderate-[h]igh category for supervision and intervention."

"likely to continue to drive his behavior in the community, and . . . would be further enhanced or supported by problematic antisocial and psychopathic personality characteristics despite his age." Dr. Roquet pointed out that R.E.B.'s sexual preoccupation manifested itself in his continued reporting of "ongoing pop-ups" and in his "strong arousal to young boys." Dr. Roquet reconciled R.E.B.'s continuous sexual thoughts about minors with passing the polygraph by explaining that the polygraph "has to do with behavior, . . . specifically with masturbation," so while R.E.B. "[may] not be engaging in the behavior," which was "positive," it did not "mean that the thoughts [were] . . . not present."

According to Dr. Roquet, while some of the "characteristics associated with psychopathy and antisocial personality disorder . . . start to diminish after age [forty]," there were other characteristics still present in R.E.B. that would continue to influence him. Dr. Roquet also testified that, although R.E.B.'s last offense occurred in 1993 when he was forty-five years old, the "length of time since the last offense" did "not have much of an impact . . . on the risk assessment" because "he [had] been confined for most of that time."

While other treatment team members believed R.E.B. was "making some progress in addressing some of the dynamic risk

factors," Dr. Roquet was of the opinion that, as long as R.E.B. continued to resist "dealing head-on with the pedophilic arousal," he would not be able to "integrate" and "use the kind of arousal management strategies and relapse prevention strategies . . . necessary for him to be safe in the community . . . and . . . not reoffend." Dr. Roquet was troubled by treatment team reports that R.E.B. "distance[d] himself from his deviant arousal," "present[ed] himself as more sexually benign than his history indicate[d]," and "romanticize[d] his relationship with underage males" by "refer[ing] to his victims as friends" and "confounding sexual exploitation with helping." Pointing to specific discrepancies between the official record and R.E.B.'s account of his sexual offending history, Dr. Roquet emphasized that R.E.B. needed "to shed light on his offense-related arousal with no minimization of past or present arousal" in order to make "substantial . . . progress in this problem area."

Dr. Pirelli conducted a forensic psychological evaluation of R.E.B. at his attorney's request, which included two interviews with R.E.B. Although Dr. Pirelli agreed with the diagnosis of the State's experts and acknowledged that R.E.B.'s symptoms were "not curable," he opined that the conditions did not impair R.E.B.'s volitional capacity because "he [did] have control over his behavior." Thus, Dr. Pirelli assessed R.E.B.'s risk of re-offense

10

if released into the community as "less than highly likely" and recommended a "structured . . . discharge and treatment plan" with "external monitoring." While acknowledging that R.E.B. "has a number of risk factors," Dr. Pirelli believed R.E.B. was "highly likely to comply with the plan," was "much more equipped than his peers," and, in many ways, had the "ability to actually be successful in the community."

To support his opinion, Dr. Pirelli administered the Risk for Sexual Violence Protocol (RSVP), "a structured professional judgment" measure, which includes twenty-two "empirically supported sexual violence risk factors across five domains": sexual violence history, psychological adjustment, mental disorder, social adjustment, and manageability. Dr. Pirelli disagreed that R.E.B. was resistant to treatment and believed he had made "significant treatment gains over the years" and would not "benefit from being [at the STU] any longer." Dr. Pirelli explained that the STU provided a "cognitive behavioral treatment" program to effect behavioral change, rather than "personality change." Thus, in Dr. Pirelli's opinion, R.E.B.'s personality characteristics limited his amenability to further progress in treatment there. Dr. Pirelli believed R.E.B. had achieved behavioral change, and "the things that [were] getting him hung up at this point" were not directly related to sexual violence

11

risk.  For example, Dr. Pirelli attributed R.E.B.'s interpersonal conflicts to his superior intelligence and frustrations from interacting with less intelligent peers and staff.

In an oral opinion rendered on June 7, 2017, Judge Mulvihill found by "clear and convincing evidence" that R.E.B. was "convicted of very serious sexually violent offenses"; suffers from "pedophilia and other specified personality disorder, [and] paraphilia in terms of . . . hebephilia," which "affect him emotionally, cognitively, [and] volitionally"; has "serious difficulty controlling his sexually violent behavior"; and was "[h]ighly likely at this time to sexually reoffend" if released. The judge found the State's experts "very credible" and made findings consistent with their testimony and reports.  Although he also found Dr. Pirelli's testimony credible, he credited the contrary opinion of the State's experts regarding R.E.B.'s current risk to reoffend.

Judge Mulvihill recounted R.E.B.'s extensive criminal history and acknowledged that the offenses occurred over twenty-four years earlier, but found "[s]ignificance in [the] number of victims, the age range, the persistence of offending, [and] the variety of sexual activities."  Additionally, the judge detailed R.E.B.'s extensive treatment history and acknowledged that he had received a "significant amount of treatment," had "completed all treatment

12

modules," and "made a lot of progress," but this did "not mitigate his risk completely" or lower it to "less than highly likely." The judge explained that despite being active in treatment, having superior intelligence, and understanding the concepts, R.E.B. "still struggle[d] with his deviant arousal" and "[did] not have full command of his sexual assault cycle." The judge stated that R.E.B. had to work on ensuring that he understood that it was "not okay in any way, shape or form to act upon his deviancy towards underage boys." Judge Mulvihill entered a memorializing order continuing R.E.B.'s commitment, and this appeal followed.

On appeal,[6] R.E.B. argues Judge Mulvihill misapplied the applicable principles in concluding that he continued to pose a risk and was highly likely to reoffend sexually if released. In support, R.E.B. points to his advanced age and medical condition, and to the length of time he has spent at the STU with good institutional behavior. He claims the judge ignored the lack of recent evidence of sexual deviancy and only relied on evidence from his dated convictions. We reject these arguments and affirm.

"The scope of appellate review of a commitment determination is extremely narrow." R.F., 217 N.J. at 174 (quoting In re D.C.,

---

[6] By agreement of the parties and with the permission of the court, the appeal was argued without briefs. We summarize the points raised by appellant based upon the presentation at oral argument.

146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).

"The SVPA authorizes the involuntary commitment of an individual believed to be a 'sexually violent predator' as defined by the Act." In re Commitment of W.Z., 173 N.J. 109, 127 (2002) (citing N.J.S.A. 30:4-27.28). "The definition of 'sexually violent predator' requires proof of past sexually violent behavior through its precondition of a 'sexually violent offense.'" Ibid. It also requires that the person "suffer[] from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." Ibid. (quoting N.J.S.A. 30:4-27.26).

"[T]he mental condition must affect an individual's ability to control his or her sexually harmful conduct." Ibid. "Inherent in some diagnoses will be sexual compulsivity (i.e., paraphilia)[,] [b]ut, the diagnosis of each sexually violent predator susceptible to civil commitment need not include a diagnosis of 'sexual compulsion.'" Id. at 129.

The same standard that supports the initial involuntary commitment of a sex offender under the Act applies to the annual

14

review hearing. In re Civil Commitment of E.D., 183 N.J. 536, 551 (2005). In either case, "the State must prove by clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend." Ibid. (quoting W.Z., 173 N.J. at 133-34).

As the fact finder, a "trial judge is 'not required to accept all or any part of [an] expert opinion[].'" R.F., 217 N.J. at 174 (alterations in original) (quoting D.C., 146 N.J. at 61). Furthermore, "an appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58).

We find no clear mistake on this record. We are satisfied that the record amply supports Judge Mulvihill's finding that R.E.B. suffers from pedophilia, other specified paraphilic disorder, and other specified personality disorder, a necessary predicate for continued commitment under the SVPA. See, e.g., In re Civil Commitment of D.Y., 218 N.J. 359, 381 (2014). Based on credible expert testimony, the judge determined that R.E.B.'s disorders, past behavior and treatment progress demonstrated that he was highly likely to engage in acts of sexual violence unless

confined.  The judge's determination, to which we owe the "utmost deference" and may modify only where there is a clear abuse of discretion, In re Commitment of J.P., 339 N.J. Super. 443, 459 (App. Div. 2001) (quoting State v. Fields, 77 N.J. 282,311 (1978)), was proper.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION