# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3236-16T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF N.W.,
SVP-279-02.

_____

Argued August 29, 2018 – Decided October 16, 2018

Before Judges Alvarez and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-279-02.

Susan Remis Silver, Assistant Deputy Public Defender, argued the cause for appellant N.W. (Joseph E. Krakora, Public Defender, attorney; Susan Remis Silver, of counsel and on the briefs).

Mark D. McNally, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Mark D. McNally, on the brief).

PER CURIAM

N.W., born March 1982, appeals from the February 23, 2017 Law Division order continuing his civil commitment to the Special Treatment Unit

(STU), the secure facility designated for the custody, care, and treatment of sexually violent predators, pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38.  We affirm.

An involuntary civil commitment can follow service of a sentence, or other criminal disposition, when the offender "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care, and treatment." N.J.S.A. 30:4-27.26.  We need not recount N.W.'s past history of sexually violent conduct and aberrational sexual behavior, the circumstances of his original admission to the STU in 2002, or his record of infractions while institutionalized.  They are recounted at length in our prior opinions.  See In re Civil Commitment of N.W., No. A-2333-02 (App. Div. June 2, 2004), certif. denied, 182 N.J. 429 (2005); In re Civil Commitment of N.W., No. A-4937-05 (App. Div. Jan. 22, 2007); In re Civil Commitment of N.M.W., No. A-4610-06 (App. Div. Nov. 15, 2007), certif. denied, 195 N.J. 418 (2008); In re Civil Commitment of N.M.W., No. A-4434-07 (App. Div. Nov. 18, 2008); In re Civil Commitment of N.M.W., No. A-4405-08 (App. Div. Jan. 8, 2010); In re Civil Commitment of N.M.W., No. A-3882-09 (App. Div. Dec. 17, 2010); In re Civil

Commitment of N.M.W., No. A-4102-11 (App. Div. Aug. 15, 2012); and In re Civil Commitment of N.M.W., No. A-3516-12 (App. Div. Nov. 25, 2013).

Suffice it to say that we have already determined, as the law of the case, that N.W.'s 2000 conviction falls within the statutory definition of a sexually violent offense under N.J.S.A. 30:4-27.26. See State v. Reldan, 100 N.J. 187, 203 (1985) (reciting elements of the law of the case doctrine). To summarize, that conviction stemmed from N.W. brutally beating and sexually assaulting a thirty-four-year-old woman at gunpoint by forcible vaginal intercourse on December 22, 1997, when he was fifteen-years-old. After waiver to adult criminal court, N.W. pled guilty to the sexual assault and was sentenced to a five-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. As part of the plea agreement, the State dismissed the remaining counts of the indictment, which included a charge that later that same day, N.W. robbed and sexually assaulted a thirty-six-year-old woman at gunpoint by forcing her to have vaginal intercourse and oral sex.

Prior to his incarceration, N.W. had an extensive juvenile history beginning at age thirteen and consisting of at least twelve arrests for non-sexual offenses, three arrests for sexual offenses involving two male and two female

adolescent victims,[1] and three adjudications of delinquency. While incarcerated, N.W. received numerous disciplinary infractions, several of which were violent and sex related. In 2002, shortly before N.W.'s scheduled release date, the State's petition for civil commitment under the SVPA was granted. N.W. has been confined at the STU since that time and has been placed on "modified activities program" (MAP)[2] status several times due to inappropriate sexual behavior involving exhibitionism and masturbation. Since his initial commitment, he has had multiple annual review hearings, all of which have resulted in judicial findings, by clear and convincing evidence, that N.W. remains afflicted with mental abnormalities that make it highly likely that he will commit sexually violent offenses if released into the community.

The present appeal arises out of the review hearing conducted by Judge James F. Mulvihill on February 23, 2017. At the hearing, the State presented expert testimony from Indra Cidambi, M.D., a psychiatrist who conducted a forensic psychiatric evaluation, including an interview of N.W. on February 7,

---

[1] The sex offense charges were ultimately dismissed.

[2] MAP, a component of the clinical treatment program at the STU that focuses on stabilizing disruptive or dangerous behaviors, is a behavior-related treatment modality. M.X.L. v. N.J. Dept. of Human Servs./N.J. Dept. of Corrs., 379 N.J. Super. 37, 45 (App. Div. 2005).

A-3236-16T5

2017, and Zachary Yeoman, Psy.D., a psychologist and member of the STU's Treatment Progress Review Committee (TPRC) that conducted N.W.'s annual review. N.W. presented expert testimony from Christopher P. Lorah, Ph.D., a psychologist who interviewed N.W. on February 8, 2017. The experts' reports as well as various treatment notes relied upon by the experts in formulating their opinions were also admitted into evidence.

Both Cidambi and Yeoman opined that N.W. suffered from a mental abnormality or personality disorder, which predisposed him to sexually reoffend. They diagnosed N.W. with other specified paraphilic disorder (non-consent; provisional), exhibitionistic disorder, antisocial personality disorder, cannabis use disorder, and alcohol use disorder. They testified that the combination of antisocial personality disorder, sexual pathologies, and substance abuse increased the risk of reoffending. They opined that these conditions do not spontaneously remit but affect N.W. emotionally, cognitively, and volitionally so as to predispose him to sexually reoffend.

Cidambi and Yeoman determined that N.W.'s Static-99R[3] score was eight, which indicated a high risk for reoffending. Yeoman also determined that

---

[3] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent

N.W.'s Stable 2007 score was fourteen, which "place[d] him in the high range of dynamic risk."[4] Additionally, Yeoman reported that N.W. scored "a prorated score of 24.4" on the Psychopathy Checklist-Revised, 2nd Edition (PCL-R),[5] which was "at the upper threshold of the moderate range of psychopathy." Yeoman explained that "while he [did] not officially meet the diagnostic criteria, he[] [is] . . . on the border of the moderate or high range," which indicated "that relative to other sexual offenders, [N.W.] appear[ed] to be a well above average risk for recidivism."

In discussing N.W.'s sexual offending history, Cidambi acknowledged that N.W. only admitted to his index offense against the thirty-four-year-old

___

offenses." In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014) (citing Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003)). Our Supreme Court "has explained that actuarial information, including the Static-99, is 'simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA.'" Ibid. (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)).

[4] The Stable-2007 is another risk assessment instrument developed to help predict recidivism in sexual offenders.

[5] The PCL-R provides a dimensional score that represents the extent to which a given individual is judged to match the "prototypical psychopath." The cut-off score on the PCL-R indicative of psychopathy is 30. Thus, an individual who receives a score of 30 or above on the PCL-R meets the diagnostic criteria for psychopathy.

A-3236-16T5

woman and denied the other sex offenses, which were all dismissed. On cross-examination, she conceded the possibility that the charges were dismissed because the incidents never occurred. She explained, however, that she considered the dismissed charges because "the spectrum of victims . . . raise[d] concern" and "the fact that he ha[d] been charged [was] important" in assessing risk.[6] Yeoman testified that during his interview with N.W., N.W. provided a different account of his sexual offending history than he had historically reported. According to Yeoman, while N.W. denied any sexual intent, he acknowledged "some sort of inappropriate sexual acts."

Cidambi testified that additional significant factors in evaluating N.W. included the fact that N.W.'s non-sexual offenses began at an early age, showing that he did not have "a healthy . . . lifestyle," as well as the trauma N.W. experienced at an early age in foster care when he was sexually abused by both of his foster parents. Yeoman testified that N.W.'s history of abuse resulted in him feeling that no one "cared about him," and, in turn, "he did[] [not] really care about himself."

---

[6] Notably, Lorah also testified that although "cases that are dismissed hold less weight[,] [t]hey still hold weight . . . ."

A-3236-16T5

According to Cidambi and Yeoman, because N.W.'s disorders do not spontaneously remit, the impulses caused by the disorders could only be controlled through treatment. Cidambi testified that although N.W. had been at the STU since 2002, he only "started engaging in treatment in a meaningful way" in 2015 and "just got promoted to Phase 3A as of January of [2017]."[7] Yeoman testified that the recommendation to advance N.W. to Phase 3 was based on N.W. "restrain[ing] himself enough to meaningfully engage in the core aspects of treatment[,] . . . restraining his sexual behavior, his impulsive behavior, and taking a bit more responsibility for his own actions, and beginning to meaningfully address the myriad of dynamic risk factors that he presents."

After recounting his institutional infractions for both sexual and non-sexual offenses, which resulted in MAP placements over the years, Cidambi testified that after N.W. was removed from MAP on December 7, 2015, he started making progress in treatment by "gaining [an] understanding of his arousal and behavioral controls . . . ." Nonetheless, according to Cidambi, as recently as November 2016, his treatment notes indicated "that he still presented

---

[7] According to Cidambi, N.W. had been "stagnant" in Phase 2 for over ten years. Cidambi described Phase 2 as the early stage of treatment, requiring a minimal level of commitment to treatment, as opposed to Phase 1, which was intended for individuals who have no interest in or are refusing treatment.

A-3236-16T5

as emotionally disregulated, [and] quite impulsive" and "managed . . . stress by using sexual behaviors." Specifically, N.W. admitted that he still had deviant thoughts while staring at female staff members, and reported making numerous obscene phone calls, and masturbating three times a day. Yeoman testified, however, that "within the last . . . five months[,]" N.W.'s behavior abated somewhat and he reported "masturbating one to two times a week."

Cidambi opined that, at this time, N.W. had not had sufficient treatment to control the impulses caused by his disorders in order "to mitigate his risk factor." According to Cidambi, N.W. was in the elementary stages of treatment and had not yet presented his sexual assault cycle, explored his deviant arousal, or demonstrated an understanding of the factors behind his sexual assaults or his cognitive distortions. Cidambi testified that N.W. "has to learn [his] sexual assault cycle and relapse prevention techniques" in order to be able to "mitigate any of his risk factor[s]." Cidambi concluded that N.W. would have serious difficulty controlling his sexual offending behavior if released at this time and "would be highly likely to reoffend if he is not being monitored in a structured environment such as [the] STU."

Likewise, Yeoman testified that "there [had] not been sufficient treatment effect yet to reduce [N.W.] below the threshold of highly likely" and he

A-3236-16T5

"believe[d] [N.W.] would be highly likely to sexually reoffend" in the foreseeable future if not committed to the STU for further treatment. In formulating his opinion, Yeoman considered N.W.'s "static" and "dynamic risk, and overall treatment effect." According to Yeoman, his static and dynamic risks were both "in the high range" because he has "demonstrated a variety of concerning behaviors in the community and since he[] [has] been incarcerated and committed." Yeoman stated that "[w]hile those [behaviors] are beginning to change, he[] [has] not done enough yet to . . . reduce his dynamic risk sufficiently." Acknowledging that "his overall negative emotionality has decreased somewhat," Yeoman testified that N.W. "need[ed] to continue to adequately address his sexual offenses to better understand his dynamics, his cycle, and the important relapse prevention strategies that will help him manage that cycle and manage his risk."

In contrast, Lorah opined that N.W. was currently less than highly likely to commit acts of sexual violence in the foreseeable future if released from the STU. While Lorah disagreed with the State's experts' diagnosis of paraphilia not otherwise specified, he agreed with the exhibitionistic disorder diagnosis. However, he opined that the "disorder [was] a predisposing condition for sexual crimes, not necessarily sexually violent crimes." He also diagnosed N.W. with

post-traumatic stress disorder in relation to him "surviving sexual abuse as a child."

Lorah agreed with the State's experts on N.W.'s Static-99 score, and acknowledged that N.W.'s record of institutional infractions over the years demonstrated that his adjustment to structural settings was "[v]ery poor." However, Lorah explained that N.W. "made significant behavioral changes" over "the past [twelve] to [eighteen] months" and believed that N.W.'s "behavioral stability" was "noteworthy." According to Lorah, "the fact that [N.W.] has engaged treatment to such a great degree, that . . . he was able to discuss his offense cycle, . . . some risk factors, some relapse prevention techniques, [and] victim empathy" demonstrated that "he [was] able to articulate treatment goals," and "consume treatment concepts regardless of his level of participation." Acknowledging that "there [was] more work to be done," Lorah "believe[d] that [N.W.'s] needs [could] . . . be met adequately and sufficiently in the community through a conditional discharge process, monitored heavily by [t]he probation department and by the courts."

In an oral decision rendered immediately after the hearing, Judge Mulvihill found by "clear and convincing evidence" that N.W. had been convicted of a qualifying sexually violent offense under N.J.S.A. 30:4-27.26.

The judge also found "by clear and convincing evidence" that N.W. "suffer[ed] from a mental abnormality, personality disorder [that] does not spontaneously remit[]" and "[a]ffects him emotionally, cognitively, [and] volitionally." Further, the judge found by "clear and convincing evidence" that N.W. was "predisposed to sexual violence," has "serious difficulty controlling his sexually violent behavior," and was "highly likely to sexually reoffend" if released.

In rendering his decision, the judge found both of the State's experts credible, describing them as "forthright" and "knowledgeable," and made findings consistent with their testimony and reports. In contrast, Judge Mulvihill did not find the defense expert's testimony to be "credible in any way, shape, or form." The judge explained that it is "somewhat Pollyannaish to believe that" N.W. was ready to be discharged when he was "just at the beginning of the core phase of treatment," despite the fact that he has now "expressed to Dr. Lorah that he understands all the dynamics of [his] sexual offending and his relapse prevention . . . ." In rejecting Lorah's opinion that N.W. was not highly likely to sexually reoffend and was "ready to be conditionally discharged," Judge Mulvihill determined that Lorah's opinion was "at variance with reality and at variance with the other experts." This appeal followed.

A-3236-16T5

On appeal, N.W. raises the following points for our consideration:

POINT I

THIS COURT MUST REVERSE N.W[.]'S RECOMMITMENT ORDER SINCE IT WAS BASED ON INADMISSIBLE AND UNRELIABLE HEARSAY.

POINT II

THE TRIAL JUDGE CLEARLY ERRED WHEN HE ASSESSED N.W.'S RISK OF REOFFENDING WITHOUT CONSIDERING THAT N.W. HAD GAINED CONTROL OVER HIS SEXUALLY ASSAULTIVE BEHAVIOR THROUGH SUCCESSFUL TREATMENT AT THE STU.

"The scope of appellate review of a commitment determination is extremely narrow." R.F., 217 N.J. at 174 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).

"The SVPA authorizes the involuntary commitment of an individual believed to be a 'sexually violent predator' as defined by the Act." In re Commitment of W.Z., 173 N.J. 109, 127 (2002) (citing N.J.S.A. 30:4-27.28). "The definition of 'sexually violent predator' requires proof of past sexually violent behavior through its precondition of a 'sexually violent offense,'" which,

in N.W.'s case, is undisputed. Ibid. It also requires that the person "suffer[] from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care[,] and treatment." Ibid. (quoting N.J.S.A. 30:4-27.26).

The required "mental condition must affect [the] individual's ability to control his or her sexually harmful conduct." Ibid. "Inherent in some diagnoses will be sexual compulsivity (i.e., paraphilia)," but, "the diagnosis of each sexually violent predator susceptible to civil commitment need not include a diagnosis of 'sexual compulsion.'" Id. at 129.

The same standard that supports the initial involuntary commitment of a sex offender under the SVPA applies to the annual review hearing. In re Civil Commitment of E.D., 183 N.J. 536, 550-51 (2005). In either case, "the State must prove by clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend." Id. at 551. (quoting W.Z., 173 N.J. at 133-34).

As the fact finder, a trial judge is "not required to accept all or any part of [an] expert opinion[]." R.F., 217 N.J. at 174 (alterations in original) (quoting D.C., 146 N.J. at 61). Furthermore, "an appellate court should not modify a trial

A-3236-16T5

court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58).

We find no clear mistake in this record and are satisfied that the record amply supports Judge Mulvihill's findings. We reject N.W.'s argument that the judge erred in overruling his objection to hearsay testimony offered by the States' experts concerning "alleged sex offenses that were dismissed and that N.W. never admitted to committing." An expert is permitted to rely on hearsay information in forming an opinion concerning the committee's mental condition for purposes of civil commitment under the SVPA, particularly where, as here, the information was "of a type reasonably relied upon by experts in the particular field" and defense counsel was permitted to cross-examine the expert on the weight accorded to the dismissed offenses. In re Civil Commitment of J.H.M., 367 N.J. Super. 599, 612 (App. Div. 2003) (quoting N.J.R.E. 703). While the judge may not consider such hearsay information as substantive evidence unless an exception to the hearsay rule applies, In re Commitment of G.G.N., 372 N.J. Super. 42, 56 (App. Div. 2004), we are satisfied from our review of the record that Judge Mulvihill adhered to these principles in rendering his decision and reject N.W.'s contentions to the contrary.

We also reject N.W.'s contention that the judge erred in re-committing N.W. "without properly considering his current mental state" and "treatment" effect. Based on credible expert testimony, the judge determined that N.W.'s psychological and personality disorders, polysubstance abuse disorder, past behavior, and treatment progress demonstrated that he was highly likely to engage in acts of sexual violence unless confined. The judge's determination, to which we owe the "utmost deference" and may modify only where there is a clear abuse of discretion, In re J.P., 339 N.J. Super. 443, 459 (2001), was proper.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3236-16T5