# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0914-22

IN THE MATTER OF THE
CIVIL COMMITMENT OF
J.W., SVP-763-16.

Argued April 17, 2024 – Decided August 1, 2024

Before Judges Currier and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. SVP-763-16.

Michael Mangels, Deputy Public Defender, argued the cause for appellant J.W. (Jennifer Nicole Sellitti, Public Defender, attorney; Michael Mangels, on the briefs).

Stephen Slocum, Deputy Attorney General, argued the cause for respondent State of New Jersey (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen Slocum, on the brief).

Liza Weisberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Liza Weisberg, Alexander Shalom, and Jeanne LoCicero, on the brief).

PER CURIAM

Petitioner J.W. appeals from the October 14, 2022 order continuing his involuntary civil commitment under the New Jersey Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. J.W. asserts the State did not demonstrate the required proof that he is "highly likely" to reoffend if released. We affirm.

I.

J.W., born in 1972, has a lengthy history of sexual offenses. In 1995, he was convicted of two counts of sexual assault for kissing, "digitally penetrating," and having sexual intercourse with a twelve-year-old girl, L.D.[1] He was sentenced to seven years in prison.

During the time J.W. was sexually assaulting the twelve-year-old victim, he was having a sexual relationship with a fifteen-year-old girl, C.C., who became pregnant. J.W. married C.C. after he was released from prison. They were together for fourteen years and have four children.

In 2011, J.W. was convicted of the following: third-degree endangering the welfare of a child, after he touched his girlfriend's seven-year-old daughter's (R.R.) vagina over her clothes on numerous occasions; second-degree sexual assault of a victim and fourth-degree abuse of child/cruelty/neglect, after he

---

[1] We use initials for the minor victims to protect their privacy. R. 1:38-3(c)(12).

inappropriately touched his eight-year-old daughter on numerous occasions and was in a physical altercation with his teenage daughter and her friend. He was sentenced to seven years in prison. J.W. also has a nonsexual criminal history that involves both non-violent and violent criminal acts.

## A.

J.W. was incarcerated at the Adult Diagnostic Treatment Center (ADTC) in 2011. On November 4, 2016, prior to J.W. completing his sentence, the State submitted a petition to civilly commit him to the Special Treatment Unit (STU) under the SVPA.

In the petition, the State submitted that J.W. "was diagnosed with the following mental abnormalities and/or personality disorders: [p]edophilia (attracted to young female minors), mood disorder, [p]ersonality [d]isorder . . . with antisocial personality traits, [a]lcohol use disorder, severe, hypertension." During a 2011 evaluation, the psychologist reported that J.W. "acknowledged . . . he struggles to control his urges regarding his victims," and admitted to being sexually attracted to young females ages thirteen to fifteen and that he needed help.

The petition stated that J.W. had "scored a +6 on the Static-99R which reflects that he is in the High Risk category for sexual re-offense." The State

3

requested J.W. be declared a sexually violent predator and committed to the STU until "he is no longer a danger to society and is not likely to engage in acts of sexual violence if released." On November 18, 2016, the trial court temporarily committed J.W. to the STU pending a final hearing.

On July 11, 2017, the trial court entered a consent judgment order stating that J.W. stipulated "that, if taken as true, [the State]'s proofs could prove by clear and convincing evidence that he is a sexually violent predator in need of civil commitment." The court ordered J.W. remain committed to the STU and "be placed immediately into Phase 4 of treatment." The order also stated that if J.W. continued to progress, the STU would prepare a conditional discharge plan.

In 2018 and 2019 treatment reviews, one of J.W.'s doctors consistently found discharge planning was insufficient to lower J.W.'s risk of reoffending "below the 'highly likely' level." In September 2018, J.W. was promoted to Phase 5 of treatment, despite the recommendation by the treatment team to demote him to Phase 3A. In 2019, J.W. was demoted to phase 3A "due to lack of engagement in treatment, concerns about his polygraph [tests], and viewing of child pornography during the 2017 review period." The court ordered J.W.'s continued commitment to the STU and he remained in Phase 3A treatment.

A-0914-22

On February 23, 2022, Paul Dudek, Ph.D., issued an Annual Review Report from the STU's Treatment Progress Review Committee (TPRC). The report was comprised of "all available information included in [J.W.]'s file, the written reports by, and consultation with, his treatment team, and a clinical interview with [J.W.]." The report recommended that J.W. remain in Phase 3A of treatment, which was consistent with the treatment team's recommendation.

Dr. Dudek reported that in 2021, J.W.'s treatment team described him "as an individual who struggles with deeply entrenched maladaptive patterns of thoughts and poor emotional regulation that combined has caused significant impairment in multiple life domains." The team also noted that J.W. "showed improvement" through 2021 "in his ability to utilize the offered treatment more effectively despite interruptions and modifications to the group structures caused by pandemic related precautions." However, J.W. continued to need treatment that included addressing "impulsivity, poor problem solving, negative emotionality, sexual preoccupation, use of sex as coping, deviant patterns of arousal, emotional identification with children, and deficits in relationship stability."

According to Dr. Dudek, J.W.

> is not yet an appropriate candidate for the Therapeutic Community [(TC)]. While he consistently admits to

engaging in inappropriate sexual contact with his victims, he tends towards minimizing details of his behaviors as well as the level of risk he can present to the community. He prefers to conceptualize [] his offending as something that occurred many years further past than they did and as not having much salience in terms of his current level of functioning, and as such he describes feeling at minimal risk to [reoffend] sexually.

During Dr. Dudek's interview, J.W. stated that his method of dealing with challenges—verbal aggressiveness and oppositionality—"is 'not a light bulb [he] can turn off' despite years of offered treatment." He reported being "surprised" and "[un]prepared to manage his arousal" when he was shown child pornography at the STU, which contributed to his demotion to Phase 3A. Regarding his sexual history, J.W. stated that his relationship with C.C. "allowed him to perceive of himself as faithful and in positive terms but in hindsight he sees himself as causing a 'lot of damage.'" Dr. Dudek stated J.W. was vague in any further description other than "saying he abandoned the children and sexually assaulted his own daughter which can never be undone."

The report also summarized J.W.'s psychological and physiological testing results: in 2011, the results of a Shipley-2 examination classified him as "Low/Mentally Deficient;" the TONI-4 ranked him as "Below Average"; in 2019, he received a PCL-R score of 14 indicating "he does not meet the clinical

A-0914-22

threshold for a 'prototypical psychopath'"; a Stable-2007 test[2] placed J.W. in "the moderate range of dynamic risk," with the most concerning factor being "his deviant sexual preference and poor problem solving"; he received a score of 6 on the Static-99R test,[3] placing him in the "[w]ell [a]bove [a]verage [r]isk for being charged or convicted o[f] another sexual offense."  (boldface omitted).

Dr. Dudek found J.W. suffered from the following psychiatric conditions: pedophilic disorder, other specified personality disorder with antisocial features, and moderate to severe use disorders of alcohol, opioids, and anxiolytics.  Dr. Dudek concluded:

> To [J.W.'s] credit and consistent with the 2021 T[P]RC report, [J.W.] has continued to engage in treatment at a more effective and meaningful manner.  It is concerning though that his presentations at times are not systematic and appear to vary between victim of system presentations to addressing less stressful topics such as interpersonal skills, to an approach-avoidance strategy to discussing patterns of arousal to minors that . . . contributed to his sexual offending history.

---

[2]  The Stable-2007 test predicts recidivism in sexual offenders.

[3]  The Static-99R test "position[s] offenders in terms of their relative degree of risk for sexual recidivism based on commonly available demographic and criminal history information that has been found to correlate with sexual recidivism in adult male sex offenders."

A-0914-22

Dr. Dudak recommended that J.W. remain in Phase 3A of treatment at the STU. He stated: "Until such time that the above clinical concerns and dynamic risks associated with recidivism can be effectively addressed and mitigated in treatment, [J.W.] is an individual who presents as high risk to [reoffend] sexually if not confined to the STU."

In March 2022, J.W.'s expert psychologist, Christopher P. Lorah, Ph.D., issued a report. Dr. Lorah interviewed J.W. in 2019 and 2022 and reviewed his treatment records. Dr. Lorah reported that during his 2022 interview, J.W. spoke about "how his continued potential negative reaction to rejection could lead to feeling unwanted," placing him "at risk for isolation, hopelessness, and giving up." He also "readily identified sexual attraction to girls between the ages of six and sixteen," and his preference for "vulnerable, 'abandoned, needy' or those who 'want attention.'" J.W. stated that "remaining engaged in AA/NA is imperative to his successful reintegration" and identified techniques to manage his anger, as well as stating that "[h]e engages in positive self-talk, meditation, and challenges distortions about trusting others . . . ."

Dr. Lorah summarized J.W.'s diagnoses and assessment results in his report. In discussing the Static-99R test, he stated it "is consistently the most robust predictor of sexual recidivism, but all static assessments have limitations.

Specifically, static assessments cannot measure change in risk status over time," and "a single Static-99R score is insufficient to draw conclusions about an individual offender."

Dr. Lorah concluded in his report:

> [J.W.] has done enough treatment at the [ADTC] and [STU] . . . to significantly lower his risk for sexual recidivism. His risk to sexually reoffend in the reasonably foreseeable future will fall below the highly likely level under a conditional discharge he is considered highly likely to follow. Continued confinement at the STU is no longer necessary to protect the public, but further treatment and Parole Supervision for Life (PSL) supervision along with other court recommendations in the community are recommended.
>
> . . . .
>
> The March 10, 2018 Comprehensive Discharge Plan is necessary and sufficient to maintain his risk in the community below the highly likely level. However, if he remains committed, he should continue in process and self-help groups in addition to modules (e.g., Community Preparedness).

Dr. Lorah recommended any conditional discharge include "mandatory sex offense specific treatment in a less restrictive environment and repeated administ[ration] of 'maintenance' polygraph examinations," professional evaluation and monitoring of his potential future relationships, mandatory substance abuse treatment, participation in self-help groups, community

9

supervision under PSL, no contact with any minors, GPS monitoring, a curfew, and restricted access to the internet and use of his phone. (emphasis omitted).

Elisheva Berman, M.D., MBE, evaluated J.W. in April 2022 and issued a Confidential Forensic Psychiatric Evaluation report in May. In conducting the evaluation, Dr. Berman reviewed J.W.'s treatment records, the State's petition for civil commitment, mental health and other evaluations, clinical certificates, and investigations and police reports. Dr. Berman summarized J.W.'s treatment history, including that two of the three polygraph tests J.W. took in 2018 and 2019 indicated deception in his responses.

During the telephonic interview, J.W. discussed the details of his criminal sexual offenses. He reported he "groom[ed] and manipulat[ed] [L.D. and C.C.] and engag[ed] in sexual intercourse with both girls when he was about" twenty-two years old. J.W. stated "he missed the unconditional love that was shown to him by [C.C.] after they broke up and felt he could have a similar emotional experience with" his ex-girlfriend's daughter, R.R. He admitted "he continue[d] to have an arousal to girls ages [seven] to [fifteen]." J.W. explained he was demoted to Phase 3A partially due to "pop ups," or sexual thoughts, about C.C.

Dr. Berman diagnosed J.W. with pedophilic disorder and antisocial personality disorder. The psychiatrist concluded that J.W. "ha[d] not had

10

sufficient treatment to mitigate his risk." However, she stated, "given his offense dynamics as well as his more recent engagement in treatment, he may be capable of more sufficiently mitigating his risk in the reasonably foreseeable future were he to apply himself consistently in treatment and follow the recommendations of TPRC and his treatment team."

Dr. Berman thought that a "TC could . . . be an important mitigating factor," but J.W. did "not appear sufficiently motivated to engage in the TC" at that time. She concluded:

> It is therefore my opinion, to a reasonable degree of medical certainty that at this time [J.W.] suffers from a mental abnormality that affects his cognitive, volitional, and emotional capacity such that he is highly likely to sexually reoffend if not kept under the care, control and treatment of a secure facility such as the STU.

B.

On July 11 and 18, 2022, the court conducted J.W.'s annual review hearing. The court heard testimony from the State's witnesses—Drs. Berman and Dudek, and J.W.'s witness—Dr. Lorah.

Dr. Berman testified regarding her May 2022 report. She opined that based "on the totality of [her] evaluation," J.W. remained "highly likely to sexually reoffend in the foreseeable future." She testified she found it

11

significant that J.W.'s sexual offense history was repetitive—he was arrested three times with multiple offenses leading to each arrest.

Dr. Berman noted J.W. had stated "on many occasions that he couldn't believe that he could offend against his own daughter, that he knew" it was wrong but "found it . . . difficult to stop himself." The psychiatrist also found it significant that J.W. enticed, groomed, and manipulated C.C. and L.D., and that "he was very, very intoxicated" when he assaulted his daughter. She described J.W. as having "significant difficulty with drugs and alcohol in the past," including an occasion when his child almost drowned in his care because J.W. was intoxicated.

Dr. Berman testified consistent with her report that J.W.'s treatment course at STU "had some twists and turns," but more recently he had made progress. However, the psychiatrist did not think J.W. had done all of the treatment necessary to sufficiently mitigate his risk of sexually reoffending. Dr. Berman acknowledged that TC was the next step but J.W. needed to accomplish "a few more things" before applying to the TC, such as completing his personal maintenance contract and submitting it for review and addressing the on-going confusion around his arousal polygraph results.

A-0914-22

Dr. Berman testified it was "curious" that J.W. was not able to explain more than one of the twelve steps of the self-help program, despite stating the program helped him and helped him to help others. The psychiatrist also stated that the treatment team's notes indicated that J.W. "ha[d] not been in self-help group for some time."

In testifying about J.W.'s testing scores, Dr. Berman stated a score of 6 on the Static test put him "in a category of people who sexually reoffend at a well above average rate," however, the score did not reflect anything specifically about J.W. Dr. Berman stated the diagnosis of pedophilic disorder is the diagnosis that predisposes J.W. to sexually reoffending, but the diagnoses of antisocial personality disorder and substance use disorder increase that risk. The psychiatrist reiterated J.W. had not had enough treatment to adequately control the impulses caused by the disorders. J.W. remained at a "high risk" to sexually reoffend if he was released into the community.

On cross-examination, Dr. Berman explained she considers the terms "highly likely" and "high risk" to be similar. She stated that "highly likely" to sexually reoffend means there is a "high risk" that J.W. "still has difficulty in controlling his sexually harmful behavior, and . . . he poses a risk to the community as a result." She testified that she cannot answer a question that

13

requires her to define the "likelihood" of reoffending as a percentage. She said she did "not rely[]on percent probability to come to [her] conclusion."

Dr. Berman testified that she was "not predicting" or "giving a percentage," instead she found J.W. "to be high risk to sexually reoffend, and that . . . definition is not solely based on a percent probability." She elaborated,

> [O]ne part of [high risk] would be the percent probability that we've been discussing. The other part of it has to do with factors that are specific to the individual being evaluated. So those can include dynamic factors like the ones that were scored in the Stable [test] by Dr. Dudek. That can include factors related to . . . [J.W.]'s specific dynamics. That also includes factors such as victim impact, and it also includes factors such as how easy or difficult it is to monitor somebody in the community. And . . . how they did in treatment and things like that.

She also testified that risk dynamics specific to J.W. included "interpersonal difficulty that makes it hard for him to fully engage in treatment," not being receptive to feedback, difficulty tolerating negative emotions, and not fully utilizing treatment to mitigate the risks.

The State also presented Dr. Dudek. He testified he found J.W.'s sexual offense history significant in that "it occurred over a long period of time" and "involved children . . . he was connected to, and related to, so that it was sustained over the period of time. It involved penetration. . . . [I]t was focused

toward[] prepubescence to early teenage females."  He noted J.W. committed the offenses both during the time he was abusing alcohol and drugs but also when he was not.

Dr. Dudek stated he also found it significant that J.W. was not attending self-help groups at the STU but acknowledged the pandemic and J.W.'s medical issues were other factors that could impact his participation.  He noted the treatment team's observation that J.W.'s interactions with others were often self-serving.  He expressed concern regarding "how [J.W.] would use pro-social supports to help mitigate risk, that they become more about what's self-serving, what he can gain from them, rather than necessarily something that can be mutually beneficial or pro-social."  He also stated that J.W.'s use of relationships in the past to gain access to his victims "reflect[ed] a more maladaptive pattern of getting [his] needs . . . met."

Dr. Dudek reiterated his opinion expressed in the TPRC report that J.W. "presents as high risk to reoffend sexually, unless confined to the STU."  He stated that once J.W. completed and reviewed the written programmatic materials, he should be able to apply to the TC, "and hopefully eventually be conditionally discharged through the [TC]."  He added that J.W. needs a

15

"sustained focus on . . . clinical concerns" and more polygraph testing regarding "his current arousal and masturbation practices" before entering the TC.

Dr. Dudak testified that J.W. minimized his sexual offending history as something in his past. That was concerning because he does not see the need to self-monitor and consider his past behavior in his current relationships and environmental risk factors.

In addition, Dr. Dudek noted that J.W. has the "ability to maintain two conflicting beliefs simultaneously, without feeling any dissonance," which was troubling because "he can quite literally think I can do this and I shouldn't do this at the same time, without that sense of dissonance or discord, and makes it in a sense easier to offend."

Dr. Dudek reviewed J.W.'s diagnoses and opined he had not completed enough treatment to be able to control the impulses caused by his disorders. He repeated that J.W. was at "a high risk to reoffend sexually."

After the State completed the presentation of its case, J.W. moved for a directed verdict, asserting the State failed to prove he is highly likely to sexually reoffend under the SVPA. J.W. argued the State experts did not testify that he was "at least more likely than not to reoffend."

A-0914-22

The trial court denied the motion, stating, "Both doctors have testified that the highly likely as opposed to more likely than not, which is not the standard, is not what they considered." The court found the State's witnesses "considered the specific, individual dynamic factors in correlation with the general dynamic factors" in the totality of the circumstances. In addition, the court stated:

> The assessment takes into consideration . . . his abnormality, which would cause him to reoffend. They take into consideration his gains. They take into consideration him as a person. Specifically, both of the doctors talked about his self-serving responses to things in combination with . . . the results of his scores on . . . [h]is polygraph . . . .
>
> . . . .
>
> So, the [c]ourt is satisfied that the doctors have both testified based on their review of the reports, their review of their treatment notes, their meeting with the individual, his history, and his own words and conduct, that they are satisfied that he is highly likely to reoffend if he is not maintained at the STU or someplace similar without having gone through the next level of treatments, which are required, including the programmatic system and the TC and transition in preparation for his conditional release.

J.W presented Dr. Lorah on his behalf. The psychologist opined J.W.'s level of risk was below the highly likely level, and he believed J.W. would follow the requirements of a conditional discharge. Dr. Lorah defined the

A-0914-22

"highly likely" threshold as higher than the "[m]ore likely than not" standard and "higher than [fifty-one] percent."

Dr. Lorah testified that J.W. admitted he remains attracted to females ages six to sixteen, but "[h]e was able to articulate a number of relapse prevention strategies." The psychologist was "impress[ed]" that J.W. "ha[d] a firm understanding of his limitations in terms of . . . the deviance of his sexual interests, as well as a dedication to treatments."

Dr. Lorah recommended that if J.W. was released on conditional discharge, he should continue sex offender and substance abuse treatment. Moreover, he would be subject to PSL, which would mandate housing as well as substance abuse monitoring.

Dr. Lorah testified at length regarding recidivism rates for sexual offenders as documented in a 2016 Florida article. He stated the "article indicates that there is an overestimation of risk for sexually violent predators." He further stated that a sexual offender's denial of their tendencies is not relevant to sexual recidivism.

Dr. Lorah disagreed with the State's witnesses that J.W. needed to go through the TC before being released. He stated: "Based on my review of the empirical evidence, in peer reviewed journals, in conjunction with the lack of

evidence on the STU, I cannot conclude with a reasonable degree of psychological certainty that the [TC] will significantly reduce [J.W.'s] or other individual[s'] risk for sexual recidivism."

C.

On August 12, 2022, the trial court issued a comprehensive thirty-page written decision finding the State proved by clear and convincing evidence that J.W. was "highly likely to reoffend if he is discharged from the [STU]," and ordered his continued civil commitment. In making its decision, the court considered the controlling statute and caselaw. The first two prongs under N.J.S.A. 30:4-27.26 were essentially undisputed by the parties—conviction of a sexually violent offense and a mental abnormality or personality disorder.

In turning to the third prong, the court found the State had demonstrated that J.W. "ha[d] serious difficulty controlling his harmful sexually violent behavior [and] that, consequently, he is 'highly likely' to reoffend." The court considered both Dr. Berman and Dr. Lorah's testimony and found Dr. Lorah's report and testimony were "less than persuasive." The court described Dr. Lorah's position that J.W. should be released but only with high level restrictions—including twenty-four-hour supervision and GPS monitoring—as a "it can't hurt to give it a try" approach and "haphazard."

The court noted Dr. Berman and the treatment team considered both objective data and subjective observations in reaching their conclusion that, although J.W. had made marginal progress, he continued to represent a high risk of reoffending. The court also referenced Dr. Berman's opinion that there were several factors that contributed to J.W.'s likelihood of reoffending, such as "multiple victims, substance use, [and] antisocial traits." It further emphasized Dr. Berman's observations of J.W.'s fluctuating treatment since his arrival at the STU and unfulfilled treatment requirements, and her statement that J.W.'s treatment was insufficient to mitigate his risk. The court concluded, "it is too soon for [J.W.] to be released." A memorializing order was entered on October 14, 2022.

## II.

This appeal followed. We permitted the American Civil Liberties Union (ACLU) to appear as amicus curiae.

On appeal, J.W. contends the State failed to prove he is "highly likely" to sexually reoffend since the State's experts did not even testify he was "likely" to reoffend. The ACLU argues that "[s]ubstantive due process principles require the State to prove that the person it seeks to civilly commit is at least more likely than not to reoffend." It asserts that the State's refusal to define "highly likely"

A-0914-22

to a baseline probability is "a constitutional scandal." The ACLU asks this court to clarify the standard.

Our scope of review of a commitment under the SVPA "is extremely narrow." In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)).

"[A]n appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting In re D.C., 146 N.J. at 58). The judges who hear civil commitment cases "generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Id. at 174 (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).

Our review of issues of statutory interpretation is de novo. In re Civ. Commitment of W.W., 245 N.J. 438, 448 (2021). Therefore, we "owe[] no special deference to the trial court's interpretation of the State's burden [of proof] under the SVPA." Ibid.

As J.W.'s arguments challenge the standard of proof required under the SVPA, we begin with the pertinent provision of the statute. To involuntarily commit an individual under the SVPA, the individual must be proven to be a "sexually violent predator," defined as:

a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

[N.J.S.A. 30:4-27.26.]

It is undisputed that J.W. meets the first two elements of the definition—he has multiple convictions for sexual offenses and has been diagnosed with a mental abnormality or personality disorder by all three experts. His arguments focus on the third element and what standard to apply when determining "likely to engage in acts of sexual violence if not confined."

N.J.S.A. 30:4-27.26 defines "'[l]ikely to engage in acts of sexual violence' [as] the propensity of a person to commit acts of sexual violence . . . of such a degree as to pose a threat to the health and safety of others." In considering the language of the statute, our Supreme Court has stated:

> [A] person subject to an SVPA civil commitment proceeding may be considered to "pose a threat to the health and safety of others," as that phrase appears in the SVPA, "if he or she were found, by clear and convincing evidence, to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend."

[In re Civ. Commitment of P.D., 243 N.J. 553, 566 (2020) (emphasis omitted) (quoting In re Commitment of W.Z., 173 N.J. 109, 130 (2002)).]

To meet its burden of proof, "the State typically presents the testimony of experts who opine on the likelihood that the person subject to civil commitment will reoffend." Ibid. Experts commonly "rely on actuarial assessment instruments, 'developed to assess a sex offender's risk of reoffense by comparing him or her to the risk characteristics of groups of other sex offenders monitored for recidivism.'" Ibid. (quoting W.Z., 173 N.J. at 133). While an actuarial assessment measures static factors, experts also consider dynamic factors which "relate to the characteristics of the offender and community support." Id. at 566-67 (quoting In re Registrant H.M., 343 N.J. Super. 219, 223 (App. Div. 2001)).

The ultimate determination by the trial court "is 'a legal one, not a medical one, even though it is guided by medical expert testimony'"; accordingly, "[a] trial judge is 'not required to accept all or any part of [an] expert['s] opinion[].'" R.F., 217 N.J. at 174 (second and last alterations in original) (quoting D.C., 146 N.J. at 59, 61). "The State cannot confine a person because it is reasonably likely that he will not be able to abide by all of society's laws or norms. SVPA commitment is limited to those who are highly likely to sexually reoffend." Id. at 173 (emphasis omitted).

A-0914-22

Despite the legislative definition of the phrase, and the Court's clear language in W.Z. and P.D. that the State must show it is "highly likely" the individual will reoffend, J.W. and amicus urge this court to fashion a more specific definition:  "that the State must at least prove that an individual is more likely than not to reoffend."  J.W. does not proffer any authority to support this proposed statistics-oriented standard.

In W.Z., the Court upheld the constitutionality of the SVPA and added the "serious difficulty" standard to the likelihood requirement.  173 N.J. at 133-34. The Court declined to adopt W.Z.'s argument that the State must prove an individual was "'substantially likely to engage in acts of sexual violence' . . . to satisfy the clear and convincing burden of proof required for commitment under the SVPA."  Id. at 131 (emphasis omitted) (citing In re Commitment of W.Z., 339 N.J. Super. 549, 580 (App. Div. 2001), modified and aff'd, 173 N.J. 109 (2002)).

The Court noted the "difficulty" with "linki[ng] the probability of reoffending to . . . a quantum of proof," such as "a preponderance, or a more than fifty-percent chance."  Id. at 131-32.  The Court explained "[t]hose descriptions can cause confusion where the parties must present and the trial

court must evaluate difficult, nuanced medical evidence and reduce it to specific findings affecting a person's liberty." Id. at 132. The Court further stated:

> Because we see no basis for separating the court's determination of a person's likelihood to engage in acts of sexual violence from the court's assessment of the person's loss of control over his or her harmful behavior specifically, we are persuaded that we should construe the term "likely to engage in acts of sexual violence" in light of the constitutionally required standard for loss of control. To be committed under the SVPA an individual must be proven to be a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts. Pursuant to our holding today, the State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend.
>
> . . . Commitment is based on the individual's danger to self and others because of his or her present serious difficulty with control over dangerous sexual behavior.
>
> [Id. at 132-33 (emphasis omitted).]

The Court reaffirmed the use of the three prongs and the W.Z. language in P.D., reiterating the use of expert testimony to "opine on the likelihood that the person subject to civil commitment will reoffend." 243 N.J. at 566.

Bound by our Supreme Court's precedent and the plain text of the SVPA, we decline J.W.'s invitation to establish a statistical quantification or a new standard.

25

Cf. Pannucci v. Edgewood Park Senior Hous.-Phase 1, LLC, 465 N.J. Super. 403, 414, (App. Div. 2020) ("[Plaintiff] asks us to change the law the Supreme Court has established. That, we may not do." (citing State v. Steffanelli, 133 N.J. Super. 512, 514 (App. Div. 1975))). To continue commitment, the State must demonstrate the individual is highly likely to engage in sexually violent behavior if released. This entails proof that the individual has serious difficulty controlling their harmful behavior so as to pose a threat to the safety of the community.

The State met its burden here. In the evaluations conducted for the 2022 review, J.W. reported to the experts and treatment team that he is still aroused by young females. In the three polygraphs done in 2018 and 2019, two of the results indicated deception. His participation in treatment is progressing, but only recently. The treatment team reported J.W.'s self-serving nature, as well as their skepticism regarding his genuineness in his interactions with others and in treatment. They also indicated, and J.W. agreed, that he does not take feedback well.

While the expert testimony and reports detailed the testing tools and the experts' opinions of the static, dynamic, and otherwise significant factors, each expert testified that the Static-99R is the best static measure and J.W.'s score of 6 places him in the well above average risk to reoffend group.

After hearing the experts' testimony and reviewing all of the submitted evidence, the trial court found Dr. Berman's opinion and reasoning supported the court's determination to continue J.W.'s commitment. The court noted Dr. Berman's observations that there were several factors present that contributed to J.W.'s likelihood of reoffending, such as "multiple victims, substance use, [and] antisocial traits." It also recounted Dr. Berman's observations regarding J.W.'s fluctuating treatment since his arrival at the STU and unfulfilled treatment requirements, and her opinion that J.W.'s treatment was insufficient to mitigate his risk.

Dr. Berman opined that J.W. remained at a "high risk" to sexually reoffend if he was released into the community. The psychiatrist explained she considers the terms "highly likely" and "high risk" to be similar. She stated that "highly likely" to sexually reoffend means there is a "high risk" that J.W. "still has difficulty in controlling his sexually harmful behavior, and . . . he poses a risk to the community as a result."

This language supports the State's burden of proof under the SVPA and the caselaw. Through its experts, the State demonstrated J.W. was, at the time of their evaluation, unable to control his harmful behavior and remained a threat to the community if released. Of course, under the SVPA, J.W. will undergo

yearly review hearings during which the trial court will assess current information and determine J.W.'s ongoing need for involuntary civil commitment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0914-22